| | |
|---|---|
| DISTRICT COURT<br>CITY & COUNTY OF DENVER, COLORADO<br><br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED: September 14, 2023 12:13 PM<br>CASE NUMBER: 2021CV31268 |
| **Plaintiffs**: DOGWOOD REALTY GROUP TRUST;<br>DAVID BLUMENFELD; EDWARD<br>BLUMENFELD; and MAX BLUMENFELD<br><br>v.<br><br>**Defendants**: KIMBERLEY TEW and MICHAEL<br>TEW | ▲ COURT USE ONLY ▲<br><br>Case Number: 2021CV31268<br><br>Courtroom: 269 |
| ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND<br>DEFENDANT MICHAEL TEW'S MOTION FOR SUMMARY JUDGMENT | |

Before the Court are Plaintiffs' motion for summary judgment and Defendant Michael[1] Tew's motion for summary judgment. The Court received responses and replies for each motion, along with exhibits and affidavits. The Court finds and orders as follows:

The Court initially notes that Plaintiffs filed a 23-page motion and attached an additional 12 pages of the facts they claim are undisputed. The Rules of Civil Procedure do not contemplate that statements of facts may be filed separately from the motion and Plaintiffs' briefing violates the page limits for motions set out in Rule 121, § 1-15. The Court will not accept such motions in the future.

---

[1] Because this case involves multiple family members, this order refers to parties by both their first and last names for purposes of clarity.

CIV_00000630

## I.    Material Undisputed Facts

The Court recites only those undisputed facts material to the issues raised in the motions. The Court's undisputed facts are taken from the parties' affidavits and other documentary evidence attached to the motions; the Court does not rely on unsworn statements contained in the parties' briefs or unsworn statements made by the parties during discovery dispute conferences when determining the undisputed facts. The Court accepts the following facts as undisputed for purposes of these motions only.

Plaintiff David Blumenfeld was introduced to Kimberley Tew by Sandy Goldfarb who said that Kimberley Tew traded cryptocurrency on his behalf. In December 2017, David Blumenfeld and Kimberley Tew discussed cryptocurrency investments. Kimberley Tew represented that she was "not a broker [but did] this for fun." She also offered advice about cryptocurrency investment but disclaimed, "[w]hat do I know though. I'm a mom!" On December 29, 2017, David Blumenfeld texted Kimberley Tew, "If Sandy trusts you so do I."[2] The parties' arrangement appears to have been conducted primarily through texts and emails.

The parties then embarked on a relationship in which Plaintiffs provided funds to Kimberley Tew and she invested them in cryptocurrency on their behalf. The terms of the agreement (or agreements) were not in writing. In exchange for investing Plaintiffs' funds in cryptocurrency, Kimberley Tew did not receive any compensation,

---

[2] Many of the parties' text messages do not identify the dates of the communications, the Court accepts those dates that are established through Plaintiffs' affidavits, which have not been contested by Defendants.

CIV_00000631

but was to receive introductions to Plaintiffs' network for whom she could also invest. After the parties' entered into their arrangement, David Blumenfeld offered to connect Kimberley Tew with professionals in the medical community who may be able to help her daughter.

David Blumenfeld transferred $15,000 from Dogwood Realty Group Trust through a third party to Kimberley Tew on December 21, 2017. David Blumenfeld also transferred $15,000 of his own funds to Kimberley Tew through a third party on the same day. Kimberley Tew confirmed receipt and that she was "sending the funds to the exchange to purchase crypto." On December 27, 2017, Kimberley Tew confirmed she purchased "30.61224 ZEC @ $490." At one point, David Blumenfeld asked Kimberley Tew "how much did I purchase" and she replied, "I purchased 15K." Kimberley Tew texted David Blumenfeld about the value of cryptocurrency she purchased on December 27, 28, and 29, 2017.

In January 2018, David Blumenfeld told Kimberley Tew that he "had to offer" his father, Edward Blumenfeld, and his brother an opportunity to invest cryptocurrency with Kimberley Tew and asked if she "didn't mind." Kimberley Tew said she did not mind because "it's family." In January 2018, Kimberley Tew provided David Blumenfeld with additional information about bank accounts in her name; on January 12, 2018, Edward Blumenfeld transferred Kimberley Tew $50,000. On January 19, 2018, Edward Blumenfeld transferred another $50,000 to Kimberley Tew. At the time of these exchanges, Kimberley Tew mentioned several

3

cryptocurrency changes: Kraken, GDAX, and Gemini. On May 16, 2019, David Blumenfeld transferred $35,000 to Kimberley Tew.

Kimberley Tew periodically texted David Blumenfeld with updates on the cryptocurrency investments. They communicated by text about rises and falls in the value of the cryptocurrency and her analysis of the cryptocurrency market. The parties exchanged text messages on January 19, 20, February 5, March 1, 29, April 19, and December 25, 2018, and June 27, 2019. Some of Kimberley Tew's updates included graphs labeled "Blumenfeld Portfolio." Kimberley Tew also texted with Edward Blumenfeld on May 1, May 28, July 21, 31, and September 1 and 24, 2020 about the value of his investments. Kimberley Tew emailed David Blumenfeld and Edward Blumenfeld with a report of their portfolio on January 14, 2019 and described a loss of $92,000; emailed market analysis on February 7, 2019; and sent a portfolio report on April 5, 2019. Kimberley Tew emailed with Edward Blumenfeld on May 7, 2019.

At one point, Kimberley Tew said to David Blumenfeld, "you're still in 6 digits. If I think you will drop below 100K I will contact you. I have been actively trading your account and hedging/arbing[.] Probably saved 30-40K doing so." At another point, Kimberley Tew asked David Blumenfeld about his risk tolerance, specifically asking, "[o]nce I do buy and I'm holding in the interim for you what do you want your stop loss to be 10%? …If it drops more than 10% you automatically sell." David Blumenfeld responded, "I can hold unless you think it will totally crash."

4

On May 10, 2019, in a text exchange regarding increasing an investment, David Blumenfeld asked if he needed to "[g]ive [Kimberley Tew] more money," to which she responded "Not give. Haha. Invest." On an unknown date, David Blumenfeld expressed that he had not intended that Kimberley Tew "would be trading my stuff all the time." Kimberley Tew replied that she was "more than happy to help you."

David Blumenfeld referred to the trading multiple times as "hav[ing] fun" and at another point, told Kimberley Tew, "You have free reign to trade as you please. And just have fun with my funds." In addition to telling Kimberley Tew that she had free reign over the investments, David Blumenfeld stated multiple times that he would "follow [Kimberley Tew's] lead," that she was "in charge," and that David Blumenfeld was "listening to [Kimberley Tew]."

The parties' text messages reflected that Kimberley Tew was also trading for others such as "Bob," "Sandy," and "Aaron."

Some of Kimberley Tew's communications encouraged Plaintiffs' investments. Initially, Kimberley Tew encouraged David Blumenfeld saying, "Do you plan on really getting in the game because your current position is not going to achieve the results you want" and informing him that others were "buying shovels for the gold rush." Kimberley Tew later asked David Blumenfeld if his father would back him and encouraging him about the prospects to make money. On February 5, 2018, Kimberley Tew told David Blumenfeld, "[I]f you stick with me and you follow our timeline you will not lose." Kimberley Tew said to David Blumenfeld that new tokens

CIV_00000634

will be "free money" and that David Blumenfeld should "stick with me... I don't roll with quitters."   Another time, Kimberley Tew said, "I'm confident that I will be sending you a bit of spending money from profits next month." Kimberley Tew also told David Blumenfeld that his profits were going to go "UP UP UP."

At a few points, David Blumenfeld expressed concern with the investments. On January 22, 2018, David Blumenfeld emailed Kimberley Tew with concerns that the crypto world was falling apart; Kimberley Tew reassured him that he was "even at the moment," but offered to send his money back in USD. On March 18, 2018, David Blumenfeld complained about the currency "totally crashing again... And all you do is lose money." David Blumenfeld, however, does not appear to have made any efforts to end the relationship at the time of these complaints in 2018.

David Blumenfeld entered into another professional investment management agreement that referred to cryptocurrency assets and described them as "involv[ing] a high degree of risk and, in many cases, constitute[ing] a speculative investment."[3]

Kimberley Tew made numerous statements to Plaintiffs representing that she would send their money back to them upon request. Early in their relationship, Kimberley Tew told David Blumenfeld, "My plan is to meet you and Bob in Aspen at the end of the year and we can decide if you want cash or to keep going. I am confident you will be profitable. Of course, you can pull the cord whenever you want." On an unspecified date, Kimberley Tew told David Blumenfeld that she was "not planning

---

[3] Plaintiffs do not contest this evidence offered by Kimberley Tew, and therefore, the Court accepts it, although the document is incomplete.

CIV_00000635

on withdrawing all your profits without an order to do so" and would "start handing you some cash when it's there." Kimberley Tew also told David Blumenfeld that he could "take your profit and its' a great ride . . . do you want to get even and cash out? It's your money. Not mine." David Blumenfeld responded that he would follow Kimberley Tew's advice. Another time, Kimberley Tew said to David Blumenfeld, "I'm pulling you out at $500K and you're taking the cash!" When discussing that they should have sold Zcash, Kimberley Tew said "[N]ext time I'm just going to do it and send you the cash." At another point, Kimberley Tew told one of Plaintiffs, "you can tell me to sell at any point and I will." Kimberley Tew told David Blumenfeld that she would start sending money back if it would calm Edward Blumenfeld.

On September 24, 2020, Edward Blumenfeld texted Kimberley Tew and asked how to cancel their arrangement. On January 11, 2021, David Blumenfeld texted Kimberley Tew, "I don't like this sudden drop. Can we sell some. This is too steep too quickly." On January 20, 2021, Edward Blumenfeld texted Kimberley Tew about "cashing out at $46k each coin" and asking her to wire the money to David Blumenfeld.

On January 20, 2021, Kimberley Tew and David Blumenfeld discussed how she should send the money. David Blumenfeld requested a check; Kimberley Tew agreed to send the funds by check and also send a check for Edward Blumenfeld. Kimberley Tew expressed some concern about the method for transfer, saying she needed to be off the radar, stating "I know they are watching me." When the checks had not arrived, on January 26, 2021, Kimberley Tew told David Blumenfeld that the

7

delay was due to a move and new bank account; she promised to mail the funds the next day. When the funds did not arrive, David Blumenfeld again inquired on February 9, 2021. Kimberley Tew said she sent checks in a pink envelope with John Lennon stamps, but that if they did not arrive, she would overnight them via Federal Express. At this time, Kimberley Tew continued to discuss additional trading for David Blumenfeld saying, "I'll actually sell at 49 so you'll make a bit more money." On February 17, 2021, David Blumenfeld confirmed that the checks had not arrived. Kimberley Tew said she would ship the checks via Federal Express and send the tracking number. Kimberley Tew did not provide the information. On February 19, 2021, David Blumenfeld again asked Kimberley Tew about the status; she said that she was "going over the best and legal way" to make the transfers and would respond further after speaking with her attorney. David Blumenfeld texted Kimberley Tew again on February 20, 21, and 22, 2021, but received no response; on February 22, 2021, David Blumenfeld emailed Kimberley Tew to say that he was going to the authorities. Edward Blumenfeld texted Kimberley Tew on March 1, 2021, asking to make arrangements to have cryptocurrency coins delivered to his lawyers in Denver.

Max Blumenfeld did not know about the exchanges between Kimberley Tew and his father and grandfather about returning their funds when he reached out to Kimberley Tew on January 30, 2021. Max Blumenfeld said that he was interested in buying Ripple cryptocurrency, but that New York made it very difficult. He wondered if he could purchase it through Kimberley Tew. Max Blumenfeld said he "saw XRP today and read some Chinese blogs about them pumping it . . . I'm in NY binance isn't

CIV_00000637

allowed here and Coinbase dropped ripple." Kimberley Tew told him that she was not a registered broker dealer and was just a mom. Max Blumenfeld told Kimberley Tew, "[W]e're okay with risk on this particular trade" and discussed the price at which he would sell. She directed Max Blumenfeld to send funds through her father's email address. Max Blumenfeld made eight transfers between January 30, 2021 and February 11, 2021 totaling $18,500. Kimberley Tew refunded $2,000 to Max Blumenfeld on February 17, 2021. During these exchanges, Kimberley Tew asked Max Blumenfeld if the feds asked him to buy through her. She also asked to move their conversation to Telegram because she was "super paranoid."

Max Blumenfeld understood that Kimberley Tew would sell him bitcoin from her personal holdings at a discounted rate because she needed cash. Max Blumenfeld also appeared to urgently need the cryptocurrency and requested that he receive it the same day. Max Blumenfeld understood that Kimberley Tew was "giving him a 30K Bitcoin for 17k" but later understood that she "wanted 25, not 17." He agreed to that. Max Blumenfeld then said he was "just really confused" about the arrangement.

Kimberley Tew demanded payment and then said she was "done . . . I'll refund you in full." She repeated several times that she did not want anything from Max Blumenfeld and would refund him in full. Max Blumenfeld asked Kimberley Tew to "send [his funds] now" and repeated that "today really is the deadline to get this done." Max Blumenfeld ultimately asked Kimberley Tew to put him in touch with her lawyer so that "we can resolve this." At this point, the communication between Kimberley Tew and Max Blumenfeld appears to have ended.

9

CIV_00000638

Plaintiffs did not make any agreements with Michael Tew in writing or otherwise, and it does not appear that Plaintiffs ever communicated with Michael Tew. Michael Tew had exclusive ownership of a Gemini cryptocurrency account, opened on November 27, 2017. Kimberley Tew's Gemini cryptocurrency account was closed on May 22, 2018. Michael Tew's Gemini account began active trading on August 9, 2018. Four bank accounts are linked to Michael Tew's Gemini account and Michael Tew is listed as the owner on those accounts. Michael Tew's Gemini account received a total of $50,800 in transfers in August 2018 in multiple smaller amounts ranging from $100 to $15,000. In September 2018, Gemini noted a complaint that the Tews had created an algorithm scam; Gemini flagged Michael Tew's account as high risk. In March 2019, Gemini rejected attempts by Kimberley Tew to open other accounts and instructed staff not to accept other accounts with her. As of March 5, 2019, Gemini records show that her account was "automatically closed" and "all orders have been canceled." In September 2019, Gemini also "blacklisted" Michael Tew's account.

Plaintiffs' counsel wrote Defendants' counsel on April 2, 2021 to outline Plaintiffs' claims and request that Kimberley Tew correct her alleged misdeeds. Kimberley Tew never returned any funds to Plaintiffs.

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material

CIV_00000639

fact, such that the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c); *Andersen v. Lindenbaum*, 160 P.3d 237, 239 (Colo. 2007).

A material fact is one that affects the outcome of a case. *Trigg v. State Farm Mut. Auto. Ins. Co.*, 129 P.3d 1099, 1101 (Colo. App. 2005). Additionally, the issue in dispute must be genuine, such that the evidence provided in opposition of summary judgment sufficiently demonstrates a reasonable jury could return a verdict in favor of the non-moving party. *Andersen*, 160 P.3d at 239 (referencing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden to establish the nonexistence of a genuine issue of material fact. *Gibbons v. Ludlow*, 2013 CO 49, ¶ 11. Once that initial burden is met, the burden shifts to the nonmoving party to demonstrate that a triable issue of fact exists. *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 713 (Colo. 1987). If the nonmoving party cannot provide sufficient evidence to establish the existence of a triable issue of fact, then the moving party is entitled to judgment as a matter of law. *Gibbons*, 2013 CO 49, ¶ 11.

All inferences from the undisputed facts must be drawn in favor of the nonmoving party, and any doubts regarding the existence of a triable issue must be resolved against the moving party. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004). The trial court's role in evaluating a summary judgment motion is not to weigh the evidence and make conclusions, but to identify whether a genuine issue is present for the jury. *Andersen*, 160 P.3d at 239.

CIV_00000640

"Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1339–40 (Colo. 1988).

## III.   Analysis

### A.  Plaintiffs' motion for summary judgment against Kimberley Tew

Plaintiffs move for summary judgment on some of their claims against Defendants.[4] Because Michael Tew filed a separate cross-motion for summary judgment on all claims against him, the Court addresses only Plaintiffs' claims against Kimberley Tew in this section of the order and addresses Plaintiffs' motion against Michael Tew in conjunction with Michael Tew's motion against Plaintiffs.

#### 1.  Civil theft

Plaintiffs move for summary judgment on their civil theft claim asserting that Kimberley Tew received, but did not return, Plaintiffs' funds. Kimberley Tew responds that there was no intent to permanently deprive Plaintiffs of the funds. Kimberley Tew also asserts that David Blumenfeld's request in January 2021 was for the return of only two Bitcoin and that there were then a series of "miscommunications" about a method and timeline for the return of funds.

On a claim for civil theft, a plaintiff must establish the elements of criminal theft: that the defendant knowingly obtains, retains, or exercises control over anything of value of another without authorization or by threat or deception, and that

---

[4] Plaintiffs do not move for summary judgment on their replevin or conspiracy claims.

12

the defendant acts intentionally in other ways such as by intending to deprive the other person permanently of the use or benefit of the thing of value. § 18-4-401(1), -(1)(a), C.R.S.[5]; *see also Scott v. Scott*, 2018 COA 25, ¶ 26. The requisite intent "may be inferred from the defendant's conduct and the circumstances of the case, but requires proof of a knowing use by the defendant inconsistent with the owner's permanent use and benefit." *Huffman v. Westmoreland Coal Co.*, 205 P.3d 501, 509 (Colo. App. 2009); *People v. Carr*, 841 P.2d 361, 363 (Colo. App. 1992) ("Intent does not have to be proven by direct, substantive evidence . . . .").

Exercising control over property "without authorization" means "that the owner of the property, or a person in possession of the property with the owner's consent, has not given the actor permission to exercise control over the property." *People v. Gracey*, 940 P.2d 1050, 1052 (Colo. App. 1996) (internal quotations omitted). Theft may be established even when initial control over a thing of value is authorized if the facts establish that the authorization ended. *People v. Treat*, 193 Colo. 570, 575, 568 P.2d 473, 475-76 (1977).

Here, Plaintiffs established that they transferred their funds to Kimberley Tew under circumstances indicating that they intended for her to return the funds to them. Kimberley Tew has not returned the funds despite Plaintiffs having demanded

---

[5] The Court analyzes Plaintiffs' theft claim under § 18-4-401(1) and -401(1)(a) as the section of the civil theft statute that most closely fits these undisputed facts. Plaintiffs also cite -401(1)(e), which requires that a defendant "knowingly retains the thing of value more than 72 hours after the agreed-upon time of return in any lease or hire agreement." These facts do not involve an undisputed lease or hire agreement, as detailed below.

CIV_00000642

their return at least two and a half years ago. Kimberley Tew does not contest these essential facts. These bare facts are sufficient to establish the elements of theft, even viewing all the surrounding facts in the light most favorable to Kimberley Tew.

Kimberley Tew asserts that she cannot be liable for civil theft because she was authorized by Plaintiffs to exercise control over their funds and David Blumenfeld gave her free reign in investing. But that assertion ignores that Plaintiffs ended their arrangement with Kimberley Tew and demanded return of the funds. The undisputed facts do not establish that Plaintiffs' transfers to Kimberley Tew were intended to be permanent or that the funds were a gift to Kimberley Tew for her personal benefit. Rather, the undisputed facts establish that Plaintiffs transferred funds to Kimberley Tew to invest on Plaintiffs' behalf. This is confirmed by the many messages exchanged between the parties which reflected Kimberley Tew's understanding that the funds belonged to Plaintiffs even while they were in Kimberley Tew's possession. The Court need not detail every message reflecting Kimberley Tew's understanding, but as one example, Kimberley Tew reminded David Blumenfled, "It's your money. Not mine." Kimberley Tew's authorization over the funds ended at the point at which Plaintiffs demanded the return of their funds. Her retention of the funds after demand of their return constitutes theft.

Similarly, Kimberley Tew asserts that she did not possess the requisite intent to permanently retain the funds because she offered to return them. But again, Kimberley Tew made the offers of return before Plaintiffs requested to cancel their arrangement and demanded return of the funds.

CIV_00000643

Kimberley Tew further asserts that she attempted to return Plaintiffs' funds multiple times but was "stymied by method and timing disagreements." Resp. p.14. This characterization of the facts is unsupported. Edward Blumenfeld plainly requested to "cancel" the parties' arrangement and requested that Kimberley Tew deliver the cryptocurrency to legal counsel. While David Blumenfeld only initially indicated that he wanted to sell "some" holdings, Kimberley Tew's failure to return those funds caused his requests to escalate to the point where he said he intended to go to law enforcement authorities. The correspondence with Max Blumenfeld demonstrates that he requested the return of his funds without response. And certainly, there was a plain demand to return all funds by the point at which all Plaintiffs' counsel sent Kimberley Tew's counsel correspondence detailing civil theft and demanding a correction of Kimberley Tew's alleged misdeeds.

The Court finds that these undisputed facts demonstrate that Kimberley Tew knowingly retained and exercised control over Plaintiffs' funds without authorization and that she acted with an intent to permanently deprive Plaintiffs of the funds. The Court, therefore, finds that summary judgment should enter for Plaintiffs on their civil theft claim.

### 2. Conversion

Plaintiffs move for summary judgment on their conversion claim asserting that Kimberley Tew received Plaintiffs' funds but did not return them even after Plaintiffs requested their return. Kimberley Tew responds that she did not exercise control over

CIV_00000644

Plaintiffs' funds without authorization because Plaintiffs willingly sent the funds to her and gave her free reign over them.

"[C]onversion is any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Mason v. Farm Credit of S. Colo., ACA*, 2018 CO 46, ¶ 29 (internal quotations omitted). To state a claim of conversion, a plaintiff must allege that (i) the defendant exercised dominion or control over property; (ii) that property belonged to the plaintiff; (iii) the defendant's exercise of control was unauthorized; (iv) the plaintiff demanded return of the property; and (v) the defendant refused to return the property. *Scott*, 2018 COA 25, ¶ 31. "Unlike civil theft, conversion *does not* require that the converter act with the specific intent to permanently deprive the owner of his or her property." *Id.* ¶ 32 (holding that conversion does not rest on the defendant's knowledge or consciousness of wrongdoing or wrongful intent, and that even a good faith recipient of funds can be liable for conversion). "[T]he question of whether the actor's interference with the owner's property is serious enough to constitute a conversion of the property is usually one of degree and is a question for the finder of fact." *Md. Cas. Co. v. Messina*, 874 P.2d 1058, 1065 (Colo. 1994) (internal quotations omitted).

Here, the Court finds that the essential undisputed facts clearly establish the elements of conversion. Kimberley Tew does not contest the essential facts that Plaintiffs transferred their funds to her, that Plaintiffs demanded their return, and that she has not returned them.

CIV_00000645

Kimberley Tew's response characterizes the parties' relationship as both one in which she worked for Plaintiffs and one in which she gifted them her services and cryptocurrency. Resp. p.2. Her response also asserts that she "was just supposed to send back the initial purchase and that was it." Resp. p.5. These assertions underscore the fact that Kimberley Tew was in possession of funds that belonged to Plaintiffs. That Kimberley Tew was holding Plaintiffs' funds is affirmed by the parties' text messages. For example, although David Blumenfeld authorized Kimberley Tew to trade as she saw fit, his direction was to have fun with "*my* funds." Kimberley Tew's repeated statements to Plaintiffs about their ability to "pull the cord" or liquidate their investments also further underscore that she was in possession of Plaintiffs' funds.

Kimberley Tew argues that Plaintiffs only demanded return of two Bitcoin, not all funds previously transferred to her. The undisputed facts belie this characterization. Although David Blumenfeld's communications initially indicated that he wanted to sell some cryptocurrency, the communications escalated until he threatened to go to law enforcement. Edward Blumenfeld requested to cancel the arrangement with Kimberley Tew, and Max Blumenfeld's messages with Kimberley Tew reveal that he, too, requested a full return of his funds. And at the very least, a demand for return of all of Plaintiffs' funds was made on April 2, 2021 in correspondence from Plaintiffs' counsel.

It is undisputed that after Plaintiffs demanded return of the funds, Kimberley Tew did not return them. Even viewing the facts in the light most favorable to

17

Kimberley Tew, the Court finds that Plaintiffs have demonstrated entitlement to summary judgment in their favor on the conversion claim.

### 3. Damages on civil theft and conversion

Plaintiffs assert that their investments were worth $1,393,381.99 at the time Plaintiffs demanded their return. Under the civil theft statute, Plaintiffs request treble damages of $4,180,145.97, in addition to their attorney fees.

"The plaintiff has the burden of proof and must establish by a preponderance of the evidence that he has in fact suffered damage and that the evidence introduced provides a reasonable basis for a computation of damages." *Club Matrix, LLC v. Nassi*, 284 P.3d 93, 96 (Colo. App. 2011) (internal citation omitted). A plaintiff must provide "substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1383 (Colo. 1993). When a plaintiff submits sufficient proof of damages, the determination of the amount of damages is solely within the province of the trier of fact, and the award may not be disturbed unless it is completely unsupported by the record. *Jones v. Cruzan*, 33 P.3d 1262, 1265 (Colo. App. 2001).

Here, Plaintiffs represent that Kimberley Tew invested their funds in cryptocurrency and held certain amounts of Bitcoin, Ether, Ripple, Zcash, and Binance for them. Using formulas pulled from "Yahoo Finance" Plaintiffs assert that the fair market value of their investments totaled approximately $1.4 million. *See* Pltf. Statement of Undisputed Facts, ¶ 53 and footnotes. Plaintiffs appear to measure

18

their damages as of the time when their counsel demanded their return. Plaintiffs do not specify this date, but the Court assumes they are referring to their counsel's April 2, 2021 letter.

Kimberley Tew does not dispute Plaintiffs' claimed damages. The Court nonetheless finds that questions of fact remain regarding the amounts of cryptocurrency held by Kimberley Tew for Plaintiffs as of April 2, 2021. The documentary evidence submitted by Plaintiffs does not sufficiently establish that Kimberley Tew purchased these particular amounts of cryptocurrency, when she purchased these amounts, or that the cryptocurrency existed in Kimberley Tew's possession on April 2, 2021. In addition, the Yahoo Finance links provided by Plaintiffs do not clearly establish the value of the claimed cryptocurrency as of a date certain. Even when the damages are undisputed, the Court cannot conclude that Plaintiffs established their entitlement to the amounts claimed based on the thin record they provided.

The Court, therefore, declines to enter summary judgment on Plaintiffs' claimed damages and a finder of fact must determine the extent of Plaintiffs' damages on the civil theft and conversion claims.

### 4. Breach of contract

Plaintiffs move for summary judgment on their breach of contract claim, asserting that the parties entered into a binding agreement and Kimberley Tew breached the agreement when she did not return Plaintiffs' investments upon request.

CIV_00000648

Kimberley Tew responds that there was no agreement and no meeting of the minds as to a contract; that her cryptocurrency hedging and trading for Plaintiffs was a favor or a gift because she never received any compensation; that the nature of the parties' relationship shifted over time, belying an agreement; and that she was duped into providing trading services for Plaintiffs without compensation.

On a breach of contract claim, a plaintiff must show "(1) the existence of a contract; (2) performance under the contract by the plaintiff or some justification for nonperformance; (3) the defendant's failure to perform under the contract; and (4) resulting damages to the plaintiff." *Hemmann Mgmt. Servs. v. Mediacell, Inc.*, 176 P.3d 856, 859 (Colo. App. 2007). "When performance of a duty under a contract is due any nonperformance is a breach." *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29, ¶ 49 (citing Restatement (Second) of Contracts § 235(2) (1979)).

"[I]t is for the factfinder to determine whether the parties have entered into a contract in the first instance. More precisely, when the existence of a contract is at issue, and the evidence is conflicting or admits of more than one inference, the factfinder decides whether a contract in fact exists." *Yaekle v. Andrews*, 169 P.3d 196, 198–99 (Colo. App. 2007), *aff'd on other grounds,* 195 P.3d 1101 (Colo. 2008). To establish the existence of a contract, "the evidence must show that the parties agreed upon all essential terms." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986). The agreement is evidenced by the parties' manifestations of mutual assent. *Id.* For such manifestations, courts may look to "evidence of the parties'

CIV_00000649

conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement." *Id.*

To be enforceable, a contract must include sufficiently definite terms for a court to determine whether the contract has been performed. *Stice v. Peterson*, 144 Colo. 219, 224, 355 P.2d 948, 952 (1960). While a court may provide some contractual elements, it cannot create them, and if the language is too uncertain to identify the parties' intent, the contract is unenforceable. *Id.*

Here, the Court finds that questions of fact exist over the nature of Plaintiffs' arrangements with Kimberley Tew and whether enforceable contracts were created, including whether any agreement was supported with consideration. There are no written contracts, no documentation referring to contracts, and no references to oral contracts. The parties themselves are not clear whether one agreement covered all of Plaintiffs' investments or whether each Plaintiff had a separate agreement on the same or different terms. The text exchanges between the parties do not definitely resolve whether agreements existed between the parties on any particular terms. Discussion about contract terms appears to be entirely absent from the text messages, and the Court struggles to infer any terms from the exchanges. Indeed, even Max Blumenfeld expressed confusion about what the terms of his agreement with Kimberley Tew covered.

Viewing the facts and all inferences therefrom in the light most favorable to Kimberley Tew, the Court cannot definitively conclude that a contract existed between Plaintiffs and Kimberley Tew on sufficiently definite terms for the Court to

CIV_00000650

find that Kimberley Tew breached the contract. Therefore, a jury must determine whether any enforceable agreements existed, and if so, whether Kimberley Tew breached the terms of that agreement or agreements.[6] The Court, therefore, denies summary judgment on the contract claim.

### 5. Fraud and negligent misrepresentation

Plaintiffs move for summary judgment on their fraud and negligent misrepresentation claims, primarily asserting that Kimberley Tew 1) misrepresented her cryptocurrency experience in order to entice Plaintiffs to further invest; and 2) misrepresented that Plaintiffs controlled their funds and could pull out at any time. Kimberley Tew denies that she misrepresented her experience or expertise and that she did not falsely state that Plaintiffs could recover their funds because she offered many times to return their funds.

The elements of a fraud claim in Colorado are "(1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was

---

[6] Because the Court finds questions of fact on the elements of Plaintiffs' contract claim, it need not reach Kimberley Tew's assertion that David Blumenfeld had unclean hands because he was barred from purchasing Ripple cryptocurrency in New York, where he resides. The Court nonetheless notes that unclean hands is not a defense to a contract action seeking money damages. *See Wilson v. Prentiss*, 140 P.3d 288, 293 (Colo. App. 2006) ("The doctrine of unclean hands enables a defendant to raise an equitable defense to defeat equitable remedies, but not remedies at law."). The Court also notes Kimberley Tew does not presently provide any facts or legal authority to establish a defense of illegality.

CIV_00000651

ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff. For ease of understanding, Colorado's Model Jury Instructions unpack the fifth element into its three discrete sub-parts, requiring the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages." *Bristol Bay Prods., LLC v. Lampack*, 2013 CO 60, ¶ 26 (internal citation omitted) (citing CJI–Civ. 19:1). "[A] claim of fraud requires an intentional and knowing misrepresentation or omission . . . ." *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 17 (Eid, J., concurring) (distinguishing fraud from a scrivener's error or mutual mistake). While fraud may be inferred from the actions and statements of a party, *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540, 551 (Colo. 1997), Colorado courts also have recognized that issues such as intent and purpose generally require weighing of the evidence. *People ex rel. S.N.*, 2014 COA 116, ¶ 24.

To prove negligent misrepresentation, Plaintiffs must prove that Kimberley Tew (1) in the course of her business; (2) made a misrepresentation of material fact, without reasonable care; (3) for Plaintiffs' guidance in their business transactions; (4) with knowledge that its representations will be relied upon by Plaintiffs; and (5) Plaintiffs justifiably relied on the misrepresentation to their detriment. *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011). Whether circumstances reveal reasonable reliance is a question of fact. *P-W Invs., Inc. v. City of Westminster*, 655 P.2d 1365, 1372 (Colo. 1982).

CIV_00000652

As to Plaintiffs' assertion that Kimberley Tew made misrepresentations about her experience, Plaintiffs have not shown that any statements Kimberley Tew made about her experience or expertise were false. As a result, Plaintiffs do not demonstrate entitlement to summary judgment on this basis.

As to Plaintiffs' assertion that Kimberley Tew made misrepresentations about the return of Plaintiffs' funds, the Court finds questions of fact which preclude summary judgment. Wholly aside from the alleged falsity of Kimberley Tew's statements about Plaintiffs' ability to cash out their investments, questions of fact remain as to the reasonableness of, or justification of, Plaintiffs' reliance on those statements in these circumstances. Viewing all the facts in the light most favorable to Kimberley Tew, the undisputed facts establish that Kimberley Tew told Plaintiffs that she was not a broker, Plaintiffs appear to have transferred significant funds based only on an exchange of text messages, and Kimberley Tew's responsibilities for the funds were vaguely defined, at best. Viewing all the facts as a whole, the Court finds that a jury must determine whether under these circumstances, Plaintiffs reasonable relied on Kimberley Tew's statements that their money would be returned at any time. As a result, the Court denies summary judgment on the fraud and negligent representation claims.

### 6. Unjust enrichment and promissory estoppel

Plaintiffs move for summary judgment on their equitable claims of unjust enrichment and promissory estoppel. These equitable claims were pleaded in the alternative to Plaintiffs' claims for money damages. *See* Compl., pp.30, 32. Having

CIV_00000653

determined that Plaintiffs are entitled to summary judgment on their claims for civil theft and conversion, the Court need not reach the alternative, equitable claims. *See Elrick v. Merrill*, 10 P.3d 689, 697 (Colo. App. 2000) (finding that equitable relief will not be granted if there is a plain, adequate, and speedy remedy at law).

### B.  Michael Tew's and Plaintiffs' cross motions for summary judgment

Plaintiffs' complaint asserted claims against Michael Tew for civil theft, conspiracy to commit fraud, conversion, and unjust enrichment. The Court addresses Michael Tew's motion for summary judgment and Plaintiffs' motion for summary judgment against Michael Tew together.

#### 1.  Civil theft and conversion

Michael Tew moves for summary judgment on Plaintiffs' civil theft and conversion claims asserting that Plaintiffs cannot prove civil theft. He argues that they cannot establish that he had control over Plaintiffs' funds or that he intended to permanently deprive Plaintiffs of their property. He similarly asserts that Plaintiffs cannot prove conversion because they cannot prove that he had control over their property.

Plaintiffs respond that Michael Tew may be responsible for civil theft because the facts show that he had a Gemini cryptocurrency trading account in which there was trading activity after Kimberley Tew's Gemini account was closed. Plaintiffs make the same argument on their conversion claim.

The Court applies the authorities on civil theft and conversion previously outlined. The undisputed facts show that Plaintiffs transferred funds to Kimberley

CIV_00000654

Tew; there is no evidence that Plaintiffs directly transferred funds to Michael Tew. Michael Tew provided an affidavit stating that he did not take possession of Plaintiffs' funds.

Plaintiffs' response does not provide specific facts calling Michael Tew's denial into dispute. Plaintiffs do not establish that Michael Tew ever took possession of their funds from Kimberley Tew or that Michael Tew kept their funds after Plaintiffs demanded their return. While Plaintiffs contend that their transfers to Kimberley Tew correspond with activity in Michael Tew's Gemini account, the Court does not find that correlation to be established by the undisputed facts. The undisputed facts show that Plaintiffs transferred funds to Kimberley Tew from December 2017–January 2018 in amounts of $15,000, $15,000, $50,000, and $50,000. In the month of August 2018, Michael Tew's Gemini account received deposits totaling $50,800, made in multiple smaller denominations ranging from $100 to $15,000 and including seemingly random amounts such as $8,100. Michael Tew's Gemini account was closed by March 2019, before the next transfer from David Blumenfeld to Kimberley Tew in May 2019.

Plaintiffs do not establish that Michael Tew obtained control of Plaintiffs' funds without their authorization even when viewing the facts and inferences therefrom in the light most favorable to them. Funds were deposited in Michael Tew's Gemini account eight months after Plaintiffs gave money to Kimberley Tew and in different amounts than Plaintiffs' transfers to Kimberley Tew. The transfers between Plaintiffs and Kimberley Tew and the activity in Michael Tew's Gemini account are

26

not sufficiently close in time or amounts for proximity alone to create genuine disputes of fact regarding whether Plaintiffs' money was deposited in Michael Tew's Gemini account.

Plaintiffs reason that any cryptocurrency trading by Kimberley Tew "necessarily" transpired through Michael Tew's account, but Plaintiffs do not establish that the Gemini exchange was the sole means by which cryptocurrency may be traded; that it was the sole exchange by which Plaintiffs' funds were traded (rather, the undisputed facts reference exchanges in addition to Gemini); or that Plaintiffs' funds were placed in Michael Tew's Gemini account as opposed to Michael Tew's own funds or even funds from others for whom Kimberley Tew invested. Having elected to forego taking depositions to establish facts and without witnesses, including any experts, who can trace Plaintiffs' funds to Michael Tew's account, Plaintiffs cannot demonstrate disputes of fact that Michael Tew exercised control over their money without authorization, and as to civil theft, that he acted with an intent to permanently deprive Plaintiffs of the funds. Plaintiffs' arguments amount to mere speculation and are insufficient to create a genuine dispute of material fact, Therefore, Michael Tew is entitled summary judgment on Plaintiffs' civil theft and conversion claims.

For all the same reasons, the Court finds that Plaintiffs do not establish that they are entitled to summary judgment against Michael Tew for civil theft or conversion.

CIV_00000656

### 2. Conspiracy

Michael Tew moves for summary judgment on the conspiracy claim. He asserts that Plaintiffs cannot show that he was involved in a conspiracy to defraud Plaintiffs, including because Plaintiffs' funds were never deposited in any bank account owned or controlled by him, and that Plaintiffs do not have proof that he acted with the requisite state of mind.

To recover for civil conspiracy, a plaintiff must show "(1) an object to be accomplished; (2) an agreement by two or more persons on a course of action to accomplish that object; (3) in furtherance of that course of action, one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal; and (4) damages to the plaintiff as a proximate result." *Magin v. DVCO Fuel Sys., Inc.*, 981 P.2d 673, 674-75 (Colo. App. 1999); *see also* CJI-Civ. 27:1. "[T]he essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from the acts done in furtherance of the conspiracy." *Resol. Tr. Corp. v. Heiserman*, 898 P.2d 1049, 1055 (Colo. 1995). "The court will not infer the agreement necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).

Plaintiffs contend that Michael Tew did not meet his burden of proof to show that he was not engaged in a conspiracy. But Plaintiffs misapprehend the burden of proof. Michael Tew need only come forward to demonstrate an absence of genuine issues for trial. *TCD, Inc. v. Am. Fam. Mut. Ins. Co.*, 2012 COA 65, ¶ 7. Michael Tew

CIV_00000657

satisfied that initial burden with his affidavit that he never had Plaintiffs' property and that cryptocurrency activity in his account did not use Plaintiffs' funds. Michael Tew also pointed to the absence of any communications between him and Plaintiffs and the absence of any communications that would show an agreement between him and Kimberley Tew to defraud Plaintiffs.

After that initial showing, Plaintiffs bear the burden of proof to demonstrate that there are genuine disputes of fact on the elements of a conspiracy. *Id.* Plaintiffs respond only with the facts that Michael Tew's Gemini account became active after his wife's account closed. Even viewing these facts in the light most favorable to Plaintiffs and affording Plaintiffs all inferences from those facts, Plaintiffs do not establish an agreement between Michael Tew and Kimberley Tew on a course of action to accomplish the object of the alleged conspiracy or acts taken in furtherance of that course of action As a result, Michael Tew is entitled to summary judgment on the conspiracy claim.

### 3. Unjust enrichment

Michael Tew also moves for summary judgment on the unjust enrichment claim asserting that Plaintiffs have not proved that he received any benefit from Plaintiffs' funds. Plaintiffs respond that Michael Tew has not shown that he did not receive a benefit, that the Tews were married, and that any benefit to Kimberley Tew that supported their lifestyle was a benefit to Michael Tew.

Unjust enrichment "is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another." *Lewis v. Lewis*, 189 P.3d

CIV_00000658

1134, 1141 (Colo. 2008). A claim for unjust enrichment requires proof that "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Pulte Home Corp. v. Countryside Cmty. Ass'n, Inc.*, 2016 CO 64, ¶ 63 (internal quotations omitted).

Michael Tew met his initial burden to show an absence of disputed facts on unjust enrichment with his affidavit that he did not receive Plaintiffs' funds.

Plaintiffs then must respond to the motion for summary judgment with specific facts to demonstrate that Michael Tew received a benefit. *See* C.R.C.P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the opposing party's pleadings, but ... must set forth specific facts showing there is a genuine issue for trial."); *see also People ex rel. S.N. v. S.N.*, 2014 CO 64, ¶ 17 (finding that a litigant cannot create a genuine dispute of fact merely by asserting a conclusion without evidence to support it). *Cf. People v. Hernandez & Assocs., Inc.*, 736 P.2d 1238, 1240 (Colo. App. 1986) (finding that mere speculation is insufficient to support summary judgment). Plaintiffs contend that the burden is on Michael Tew to show that he did not benefit from Plaintiffs' funds and that he bears the burden to trace the ultimate resting point of Plaintiffs' funds. But on Michael Tew's motion, it is Plaintiffs who bear the burden to respond with sufficient facts to demonstrate a dispute as to whether Michael Tew received a benefit from any appropriation of Plaintiffs' funds; it is also Plaintiffs' burden to show facts from which a jury could find that circumstances make it unjust for him to retain that benefit. Plaintiffs' limited

30

evidence does not sufficiently create triable issues on those elements. Plaintiffs do not establish that Kimberley Tew used Plaintiffs' funds in tangible ways that benefitted Michael Tew. It is not sufficient for Plaintiffs to assert that Michael Tew was unjustly enriched simply because he was married to Kimberley Tew.

Plaintiffs assert that courts have found that a spouse may be liable for unjust enrichment when the spouse gained an interest in property obtained with misappropriated funds. But in the cases cited by Plaintiffs, proof existed that the spouse obtained property or had an interest in property that was the product of ill-gotten funds. *In re Marriage of Allen*, 724 P.2d 651, 659 (Colo. 1986) (holding that wife may be subject to an equitable lien or constructive trust for property received in separation agreement when property was obtained with embezzled funds); *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261, 918 A.2d 565 (2007) (holding that wife may be subject to a unjust enrichment claim when she wrote checks on a joint bank account that contained stolen funds); *McMerty v. Herzog*, 702 F.2d 127 (8th Cir. 1983) (affirming that wife was not entitled to proceeds of sale of land held in joint tenancy when the land was purchased with funds wrongfully acquired). Here, Plaintiffs cannot trace any wrongfully-acquired funds to Michael Tew. Plaintiffs also do not establish any specific ways in which Michael Tew benefitted from Kimberley Tew's use of Plaintiffs' funds. Plaintiffs speculate that Kimberley Tew used their money to fund her lifestyle and that Michael Tew must have benefited because they are married, but Plaintiffs have not come forward with specific facts to show particular ways in which Michael Tew benefitted.

CIV_00000660

Because Plaintiffs do not establish that Michael Tew benefitted from any use of Plaintiffs' funds, Michael Tew is entitled summary judgment on Plaintiffs' unjust enrichment claim. For the same reasons, Plaintiffs do not establish either that they are entitled to summary judgment against Michael Tew for unjust enrichment.

## IV.   Conclusion

For the reasons stated, Plaintiffs' motion for summary judgment against Kimberley Tew is GRANTED in part and DENIED in part. Michael Tew's motion for summary judgment is GRANTED; Plaintiffs' motion for summary judgment against Michael Tew is DENIED. Michael Tew is dismissed from the case.

**SO ORDERED** this 14th Day of September, 2023.

BY THE COURT

_____

STEPHANIE L. SCOVILLE
Denver District Court Judge

CIV_00000661