Case No. 1:20-cr-00305-DDD   Document 458-1   filed 03/14/24   USDC Colorado   pg 1 of 8

ASPEN CASEBOOK SERIES

# ECONOMIC ANALYSIS OF LAW

## NINTH EDITION

**RICHARD A. POSNER**

*Judge, U.S. Court of Appeals for the Seventh Circuit*
*Senior Lecturer, University of Chicago Law School*



Wolters Kluwer
Law & Business

Copyright © 2014 Richard A. Posner.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers, and Kluwer Law International products. (www.wolterskluwerlb.com)

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at www.wolterskluwerlb.com, or a written request may be faxed to our permissions department at 212-771-0803.

To contact Customer Service, e-mail customer.service@wolterskluwer.com, call 1-800-234-1660, fax 1-800-901-9075, or mail correspondence to:

> Wolters Kluwer Law & Business
> Attn: Order Department
> PO Box 990
> Frederick, MD 21705

Printed in the United States of America.

1 2 3 4 5 6 7 8 9 0

ISBN 978-1-4548-3388-8

**Library of Congress Cataloging-in-Publication Data**

Posner, Richard A.
　Economic analysis of law / Richard A. Posner, Judge, U.S. Court of Appeals for the Seventh Circuit, Senior Lecturer, University of Chicago Law School. — Ninth Edition.
　　pages cm. — (Aspen casebook series)
　Includes bibliographical references and index.
　ISBN 978-1-4548-3388-8 (alk. paper)
　1. Law and economics. I. Aspen Publishers. II. Title.

K487.E3P67 2014
349.73—dc23

2013046762



SUSTAINABLE FORESTRY INITIATIVE

Certified Sourcing
www.sfiprogram.org

# CHAPTER 7

# CRIMINAL LAW[1]

## §7.1 The Economic Nature and Function of Criminal Law

The types of wrongful conduct examined in previous chapters, mainly torts and breaches of contract, subject the wrongdoer to having to pay money damages to his victim, or sometimes to being prohibited (that is, enjoined), on pain of being sanctioned for contempt of court, from continuing or repeating the wrong—but only if the victim sues. Crimes are prosecuted by the state, however, and the criminal is ordered to pay a fine to the state or to suffer a nonpecuniary sanction such as being imprisoned. Trial procedure is also different in the two kinds of case, but examination of the procedural differences is deferred to Chapter 22. For now our interest is in why there should be distinctive sanctions, sought by the state, for some types of wrongdoing and what substantive doctrines such sanctions entail.

Five principal types of wrongful conduct are made criminal in the American legal system.

1. Intentional torts, examined in the last chapter, that represent a pure coercive transfer either of wealth or of utility from victim to wrongdoer. Murder, robbery, burglary, larceny, rape, assault and battery, mayhem, theft by false pretenses, and most other crimes that, like these, were punishable under the English common law correspond to such intentional torts as assault, battery, trespass, and conversion, although we shall see that the requirements concerning the defendant's state of mind and the presence of an actual injury sometimes differ for the criminal counterpart of the intentional tort. Here, however, are some problematic examples of crime as pure coercive transfer:

---

1. On the rules and principles, respectively, of criminal law, see Wayne R. LaFave, Criminal Law (4th ed. 2003), and Ronald N. Boyce, Donald A. Drips & Rollin M. Perkins, Criminal Law and Procedure: Cases and Materials (9th ed. 2004) (both on rules); and H.L.A. Hart, Punishment and Responsibility: Essays in the Philosophy of Law (1968), and George P. Fletcher, Rethinking Criminal Law (2d ed. 2000) (both on principles).

(1) *Counterfeiting* can be viewed as a form of theft by false pretenses — the pretense being that the payor is paying with legal tender. If the counterfeiting is discovered, the victim is whoever ends up holding the worthless currency. If it is not discovered, the loss is more widely diffused. Since counterfeiting increases the amount of money in circulation relative to the total stock of goods and services in society, everyone's money is worth less (inflation); everyone but the counterfeiter, and a debtor whose repayment obligation is in fixed dollar terms, is a loser. More important — for unless counterfeiting is widespread the effect on the supply of money will be slight — counterfeiting imposes deadweight costs in the form of the counterfeiter's tools and time (and resulting loss of productive employment) and of self-protective measures by merchants, banks, and other enterprises that receive money from the public.

(2) *Rape* bypasses the market in sexual relations (marital and otherwise) in the same way that theft bypasses markets in ordinary goods and services. But some rapists derive extra pleasure from the fact that the woman has not consented. For these rapists there is no market substitute — market transaction costs are prohibitive — and an economist might therefore argue that for them rape is not a pure coercive transfer and should not be punished if the pleasure to the rapist (as measured by what he would be willing to pay — though not to the victim — for the right to rape) exceeds the victim's physical and emotional pain. There are practical objections, such as that these rapists are hard to distinguish empirically from mere thieves of sex; that giving them free rein would induce women to invest heavily in self-protection, which would in turn incite heavy spending by rapists to overcome that investment; and that there is no objective method of measuring the rapist's utility and the victim's disutility for the purpose of deciding which is greater. But the fact that any sort of rape license is even thinkable within the framework of the wealth-maximization theory that guides the analysis in this book is a limitation on the usefulness of that theory. What generates the possibility of a rape license is the fact that the rapist's utility is weighted the same as his victim's utility. If his utility were given a zero weight in the calculus of costs and benefits, a rape license could not be efficient. But such a weighting would be based on ethical rather than economic thinking.

(3) *Marital rape.*[1] Until recently marriage was a complete defense to a charge of rape. In a society that prizes premarital virginity and marital chastity, the cardinal harm from rape is the destruction of those goods and is not inflicted by marital rape. In such societies the seduction of a married woman is a more serious crime than rape, as it is more likely to produce children — and they will not be the husband's. In such societies, moreover, the main services that a wife contributes to the marriage are sexual and procreative, and to deprive her husband of these services is to strike at the heart of the marriage. A right to demand something does not entail a right to take it by force, but it can dilute the felt impropriety of force. Furthermore, the lower

---

§7.1  1. See Richard A. Posner, Sex and Reason, ch. 14 (1992).

the divorce rate, the fewer separations there are; and proving lack of consent is harder if the married couple is still together. The exception to the negative correlation between divorce and separation is where, as in Catholic countries until recently, divorce was forbidden but formal separations, often permanent, took their place.

The reasons for not making marital rape a crime have lost force with time. For example, the increasing financial independence of women, based on their improved access to the labor market, has increased their demand for control over their reproductive capacity, so that the timing and number of their children are coordinated with their market career. Any form of involuntary intercourse impairs that control, at least in principle (for there are of course effective contraceptives), by creating the threat of a birth that will disrupt the woman's career.

Continuing with our typology of types of wrongful conduct that the law makes criminal:

2. Deliberate commission of acts that reduce social welfare, such as price fixing (on which see Chapters 9-10), as may not have been recognized at common law.

3. Voluntary, and therefore presumptively (but only presumptively, as we know from Chapters 3 through 6) value-maximizing, exchanges involving activities that the state has outlawed, such as prostitution, trafficking in child pornography, selling babies for adoption, selling regulated transportation services at prices not listed in the carrier's published tariffs, and trafficking in narcotics.

4. Certain menacing but nontortious preparatory acts, such as unsuccessfully attempting or conspiring to murder someone when the elements of a tortious attempt are missing (as they would be if, for example, the victim was not injured and didn't even know of the attempt when it was made).

5. Conduct that if allowed would complicate other forms of common law regulation. Examples are leaving the scene of an accident and fraudulently concealing assets from a judgment creditor.

Why, though, can't all five categories be left to the tort law? An answer leaps to mind for categories 3 and 4: No one is hurt. But this is a superficial answer; we could allow whomever the law was intended to protect to sue for punitive damages. A better, but incomplete, answer is that detection is difficult when there is no victim to report the wrongdoing and testify against the wrongdoer. Punitive damages can be adjusted upward to take account of the difficulty of detection; in principle this device could take care of category 5 crimes as well. But the higher the punitive damages, the less likely they are to be collectible. Another question about categories 3 and 4 is, why punish acts that don't hurt anybody? For category 3, the answer lies outside of

economics; it is difficult for an economist to understand why, if a crime is truly "victimless," the criminal should be punished — though of course ostensibly victimless crimes may, like other contractual exchanges, have third-party effects; the sale of liquor to a drunk driver is an example. For category 4, the answer is bound up with the question — to which we now turn — why tort law is not adequate to deal with categories 1 and 2 (coerced transfers in violation of common law or statutory principles).

We know from the last chapter that the proper sanction for a pure coercive transfer such as theft exceeds the law's estimate of the victim's loss — the extra something being designed to confine transfers to the market whenever market transaction costs are not prohibitive.[2] Damages equal to market value would thus be inadequate even if the owner valued the good in question at its market price. He might well value it at a higher price (remember that the market price is the value to the marginal, not the average, purchaser). The law cannot readily measure subjective values, so this is an argument for adding a hefty bonus to damages based on market value and thus for heavy punitive damages in a case of theft.

In the case of crimes that cause death or even just a substantial risk of death, properly computed damages will often be astronomical. Recall from Figure 6.3 in Chapter 6 the nonlinear relation between risk and full compensation for bearing the risk. The risk of being killed by accident is more or less randomly distributed throughout the population. But the risk of being murdered is concentrated on the relatively small number of people who constitute obstacles to the goals of persons willing to murder. The probability of those people being murdered may exceed the probability of their dying accidentally, making the proper damages award greater than in the case of a normal death, even a death caused by negligence.

We must also consider the effect of concealment on the correct level of damages. Being for the most part a by-product of lawful, public activities, accidents usually are difficult to conceal and breaches of contract usually impossible to conceal. But someone who is deliberately endeavoring to take something of value from someone else will naturally try to conceal what he is doing, and will often succeed because he has planned the concealment in advance. A handy formula for deciding how much to award in damages if the probability that the tortfeasor will actually be caught and forced to pay the damages is less than one is $D = L/p$, where $D$ is the optimal damages award, $L$ the harm caused by the tortfeasor (including any adjustment to discourage bypassing the market by coercing wealth transfers), and $p$ the probability of his being caught and made to pay $D$. If $p = 1$, $L$ and $D$ are the same amount. But if, for example, $L = \$10,000$ and $p = .1$, meaning that nine times out of ten the

---

2. Subject to two qualifications, discussed below at greater length. The first is that the wrongdoers be responsive to the higher monetary sanctions. If not, the design of a penalty structure is complicated. Second, if the costs of law enforcement are very high, it may make sense to shift some responsibility for crime prevention to potential victims of crime by lightening penalties.

§7.1.  The Economic Nature and Function of Criminal Law                257

tortfeasor escapes the clutches of the law, then $D$, the optimal penalty, is $100,000. Only if the penalty is jacked up to this level is the *expected* penalty cost to the prospective tortfeasor ($pD$) equal to the harm caused by his act ($L$).

Once damages in the pure coercive transfer case are adjusted upward to discourage efforts to bypass the market, to give effect to the nonlinear relationship between risk of death and compensation for bearing the risk, and to offset the defendant's efforts at concealment, the level of damages will often exceed the tortfeasor's ability to pay. Three responses are possible, all of which society uses. One is to impose disutility on the criminal in nonmonetary forms, such as imprisonment or death. Another is to reduce the probability of concealment of the offense by maintaining a police force to investigate crimes. A third, which involves both the maintenance of a police force and the punishment of preparatory acts (category 4), is to prevent criminal activity before it occurs. If, for reasons that will be discussed in Chapter 23, public policing is more efficient than private, the state is the enforcer and has a claim to any monetary penalties imposed. So these penalties are paid to the state as fines rather than to the victims of crime as damages. The victims can seek damages if the crime is also a tort, whether common law or statutory.

When tort remedies are an adequate deterrent because damages, including any punitive damages, are within potential defendants' ability to pay, there is no need to invoke criminal penalties, which, as explained below, are costlier than civil penalties even when only a fine is imposed. Although in some cases, such as antitrust and securities fraud, affluent defendants are both prosecuted criminally and sued civilly, criminal sanctions generally are reserved, as theory predicts, for cases in which the tort remedy bumps up against a solvency limitation. It might seem that the double punishment (tort and criminal) of the affluent in these cases would produce excessive punishment (punishment more severe than optimal, because the added severity costs more to achieve, and/or imposes greater disutility on the defendant, than the benefit in whatever slight deterrence the added severity produces). But wealth enables affluent criminal defendants to hire excellent lawyers, reducing the probability of conviction (even if the defendant is guilty) and hence the deterrent effect of the threat of criminal punishment. More important, a wealthy defendant who "gets away" with just having to pay a tort judgment, even if the judgment confiscates all his existing wealth, may be able to recoup quickly because the human capital (skills, contacts, etc.) that generated that wealth remains intact.

The decisive argument for imposing criminal sanctions on the affluent is that their wealth, however great, may fall short of the optimal level of damages because of concealment of the offense. Suppose the defendant has through criminal violations of securities law amassed $100 million, and the probability of his being caught and subjected to a tort suit is 20 percent. Then his expected punishment cost is only $20 million and is insufficient to have deterred him from the criminal activities that brought him $100 million. Which means that even the prospect of a $100 million damages award would not be sufficient to deter him, because the probability of its imposition is less than 100 percent.

The argument that the criminal law system is primarily (though not exclusively) designed for the nonaffluent is not refuted by the use of fines as a criminal penalty. They generally are much lower than the corresponding tort damages, and even then are often forgiven because of the defendant's indigence.

## §7.2  Optimal Criminal Sanctions

A person commits a crime because he thinks, though often erroneously or in the grip of madness, that the expected benefits, whether pecuniary or emotional, exceed the expected costs. Many criminals have a low IQ or psychological problems (or both) that make it difficult for them to obtain legal employment or make a competent assessment of the relative benefits and costs (including expected punishment costs) of criminal activity. Nevertheless the empirical literature on crime finds that criminals respond to changes in opportunity costs of criminals' time, in the probability of apprehension (and so in the number of police), in the length of prison terms, and in other relevant variables — and this regardless of whether the crime is committed for pecuniary gain or out of passion, or by well-educated or poorly educated people,[1] or for that matter by minors.[2]

The costs of crime include various out-of-pocket expenses (for guns, burglar tools, masks, etc.), as well as the opportunity costs of the criminal's time and the expected costs of criminal punishment. The last will be our focus, but it is useful to mention the others in order to bring out the possibility of controlling the level of criminal activity in ways other than by tinkering with the level of law enforcement activity and the severity of punishment. For example, the opportunity costs of crime could be increased, and thus the incidence of crime reduced, by reducing unemployment, which would increase the gains from lawful work.[3] The benefits of theft, and hence its incidence, might also be reduced by a redistribution of wealth away from the wealthy — or increased. It is easier to fence goods in common use, and they are more widely possessed in an egalitarian society; and a welfare system

---

§7.2  1. For summaries of the empirical literature on the rational-choice model of criminal behavior, see Steven D. Levitt, Understanding Why Crime Fell in the 1990s: Four Factors That Explain the Decline and Six That Do Not, J. Econ. Perspectives, Winter 2004, p. 163; Isaac Ehrlich, Crime, Punishment, and the Market for Offenses, 10 J. Econ. Perspectives, Winter 1996, pp. 43, 55–63; D.J. Pyle, The Economic Approach to Crime and Punishment, 6 J. Interdisciplinary Stud. 1, 4–8 (1995). For an illustrative empirical study, see Steven D. Levitt, The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation, 111 Q.J. Econ. 319 (1996).

2. See Steven D. Levitt, Juvenile Crime and Punishment, 106 J. Pol. Econ. 1156 (1998).

3. For evidence that reducing the unemployment level does indeed reduce the incidence of property crimes, but that a more important way in which prosperity reduces crime is by enabling larger state and local budgets for police and prisons, see Levitt, Understanding Why Crime Fell in the 1990s, note 1 *supra*, at 170–171.