IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00305-DDD-SBP

UNITED STATES OF AMERICA,

     Plaintiff,

v.

  1. **MICHAEL AARON TEW,** and
  2. KIMBERLEY ANN TEW, a/k/a Kimberley Vertanen,

     Defendants.

---

## GOVERNMENT'S BRIEF REGARDING DEFENDANTS' ONGOING ELIGIBILITY FOR CJA COUNSEL

---

Since December of 2022, Michael and Kimberley Tew have been the beneficiaries of a free criminal defense, funded by taxpayers through the Criminal Justice Act of 1964.[1] Last month, they were convicted by a jury of nearly all charges. ECF No. 448. At trial, the government proved the Tews conspired to steal over $5,000,000 from Michael's former employer through the submission of fake invoices from sham vendors.[2] The jury heard the Tews' motive for doing what they did: Both

---

[1]    Over this case's long history, Michael and Kimberley Tew have each cycled through numerous defense counsel, some private, and some CJA-funded. Additionally, they pursued joint counsel for a period of time before finally agreeing to and receiving separate attorneys. A summary of this procedural history can be found in the government's response to Michael Tew's motion for severance, which was filed mid-trial. *See* ECF No. 422.

[2]    The government also proved that Michael Tew failed to file any tax returns from 2016-2018.

enjoyed a lavish lifestyle, and Kimberley Tew, in particular, was addicted to gambling and speculated heavily in cryptocurrency. The couple chose, over and over again, to defraud the Victim Company over a two-year period in order to finance these selfish ends. They did so with brazen and callous disregard for any potential legal exposure.

## I.    Relevant Evidence Adduced at Trial & Procedural Background

At the same time the charged offenses were taking place, Kimberley Tew was running a cryptocurrency Ponzi scheme, in which she convinced investors to give her their money and/or digital currency, which she would purportedly invest on their behalf. Her customers' initial investments would appear to pay off spectacularly, convincing them to invest more. Once the customers were in, however, she would then feign troubles with her proprietary trading "algorithm" and/or complain of her own financial woes in order to convince them to send more and more. Those "investments" were often transferred to Kimberley via peer-to-peer payment platforms, such as PayPal, Apple Pay, Amazon Pay, and CashApp (Block, Inc.), or otherwise were transferred to her directly through crypto exchange platforms, such as Coinbase.

The jury also learned that, at least at one point, the Tews financed Kimberley's crypto habit through the purchase of gift cards from various national retailers, such as King Soopers, Target, and Walgreens. These gift cards were purchased in round-dollar amounts ranging between $500 to upwards of $3,000 at a time, and they served as a way for Kimberley to repay her crypto debtors and/or to resell the gift cards on the secondary market to obtain even more cash for even more crypto. The jury heard evidence that the Tews' true purpose behind purchasing the gift cards in

this manner was to conceal the true source of the funds (which in that case came from the Victim Company's coffers).

Likewise, the jury learned that the Tews manipulated their friends and associates into becoming witting and unwitting money mules in this crypto scam. In at least one instance, a crypto investor of Kimberley's was convinced to act as a money mule and receive the Victim Company's funds into his accounts. He testified that, although he realized this was questionable and possibly criminal behavior, he only did so because he was so desperate after losing nearly all his life savings to Kimberley.

The government also presented evidence at trial that the defendants had control and ownership of numerous bank accounts with multiple financial institutions during the time period when they were defrauding the Victim Company. The bank records showed vast quantities of the Victim Company's money being deposited in accounts owned or controlled by the Tews, which then quickly disappeared through a tangled web of bank transfers, cash withdrawals, deposits into cryptocurrency ATMS, and transfers to offshore crypto exchanges, peer-to-peer payment services, and peer-to-peer crypto trading websites.

During trial preparation, the government learned something very disturbing: It seemed the Tews' questionable banking activity was continuing, unabated, despite the fact that the defendants were subject to bond conditions. In early 2024, the government began receiving records that indicated Michael Tew continued to be employed by several companies. He was earning significant income each month, income which appeared to be quickly transferred into other bank accounts in

Kimberley Tew's name and/or otherwise invested in crypto-related speculations. This income also continued to finance a lifestyle for the Tews that would be beyond the reach of most people. For example, during the pendency of trial, the Tews rented a luxury apartment in Denver's Speer neighborhood at a cost of $8,646.69 per month.

That banking activity was concerningly similar to the conduct at issue in this case. It also appeared that it could be contradictory to the Tews' bond conditions, which placed significant financial monitoring requirements on each of them. *See* ECF No. 9 (M. Tew Bond Conditions) and ECF No. 99 (K. Tew Bond Conditions).

Following their convictions, the government sought the defendants' detention pending sentencing. In moving for that relief, the government questioned whether the recently received records also suggested that the Tews, under penalty of perjury, may have misrepresented their financial status to the court in order to obtain their CJA-funded counsel. *See* ECF No. 450. If so, and as pertinent to the prosecution's detention motion,  new offenses (e.g. perjury), may have been committed while the Tews were on bond, in direct violation of their conditions for release.

The government's suspicions also raise two practical and factually-distinct questions regarding the Tews' past and ongoing qualification for CJA-funded counsel: (1) Do the Tews owe reimbursement for any of the back-costs of their criminal defense that were incurred?, and (2) Are the Tews entitled to CJA-funded counsel going forward?

On March 12, 2024, the district court issued a minute order referring the latter question to this Court. Quoting the minute order in full:

The government's motion questions whether Mr. and Mrs. Tew <u>are still eligible for CJA-appointed counsel</u> for this case. There is sufficient evidence to call into question <u>their present eligibility</u> under 18 U.S.C. § 3006A.

The issue of whether Michael Tew and Kimberley Tew <u>remain entitled to ongoing court-appointed counsel under Section 3006A(c)</u> is therefore REFERRED to Magistrate Judge Susan Prose. All other issues raised in the government's motion, including the potential detention of Mr. and Mrs. Tew pending sentencing or the potential unsealing of any prior CJA affidavits, will be addressed at a detention hearing before this Court[.]

ECF No. 455 (emphasis added).

On March 21, this Court held a status conference to discuss how to approach the referred issue. At the status conference, the Court invited the parties to submit briefing and any supporting documentation they believe merits judicial consideration.[3] The Court also set separate *ex parte* hearings for each defendant. *See* ECF No. 462.

The government's knowledge of the Tews' present financial status is limited. The government does not know, for example, what the Tews told the courts in their prior CJA affidavits. Nor does the government know what the Tews represented to their pretrial officers while on bond. Likewise, the government does not know what the Tews would say to the court now. The government does not know if it has obtained records for all of the Tews' holdings, and for the holdings the government does know about, the prosecution has not had sufficient time to conduct a full financial accounting to understand the relationship among those holdings. The prosecution

---

[3]    Per the Court's request, the government will hand-deliver its evidence by USB drive to the clerk's office with a marking indicating that its contents are for chambers' review only and not for docketing.

also is not privy to what effects, if any, the Tews' convictions may have had on their current finances. All the government can say at this point is that the evidence it has obtained raises serious questions.

The government therefore submits this briefing and supporting evidence in advance of the defendants' *ex parte* hearings for a limited purpose: Through this filing and the submission of the records, the government seeks to provide the court with its position on the law and its understanding at this time of the evidence that it has been able to obtain. Due to the Tews' history of dishonesty both outside of the courtroom and within it, the government urges this Court to conduct a searching inquiry into the present state of the Tews' finances and their eligibility for CJA-funded counsel going forward. That inquiry should include an examination of underlying documents, and it should require fulsome disclosures, supporting extrinsic evidence, and honest explanations of all of the facts. In this case, the axiom "*dis*trust *and* verify" applies.

## II.    Summary of Recently Received Records

As noted, the government has not seen and cannot access all potential evidence of the Tews' present financial condition. Nor has the government had sufficient time to try and compare and contrast and piece together all of the records received from each institution to determine exactly how they interact. The records that the government has received, however, indicate that the couple received substantial income while this case was pending, which they quickly spent on highly questionable crypto speculation. This activity *even took place during the trial itself*.

Looking backward, this banking activity calls into question the Tews'

truthfulness when they represented their assets and liabilities to the courts.[4] It also may have implications on whether they truly complied with the conditions of their bonds pending trial. Looking forward, and as pertinent to the issue before this Court, these records may shed some light on the "present" state of the Tews' finances. To the extent that these facts undermine the Tews' prior candor with the courts, they also can be considered when evaluating whether to qualify CJA counsel through the remaining proceedings. *See infra.*

To assist the Court in reviewing these financial records, the government provides the following high-level summary and index. These summaries are not intended to go through the documents on a transaction-by-transaction basis, but instead highlight illustrative points that prove the Tews' finances must be reviewed with careful scrutiny.

- **Credit Union of Denver Bank Statements** [INV_09583-09900; INV_09953-10358]:

  o The Credit Union of Denver bank statements cover an account held by Michael Tew (x8851) between May 2021 through February 2024. That account including a "prime share" account (suffix -00) and a "basic checking account (suffix -06). Focusing on the period of the Tews' CJA appointments,[5] the x8851 account received deposits ranging from

---

[4]      *See* ECF No. 29 (M. Tew financial affidavit); ECF No. 282 (M. Tew and K. Tew financial affidavits). *See also* ECF No. 26 (M. Tew request for FPD appointment); ECF No. 175 (*pro se* letter from Tews requesting additional time to retain private counsel); ECF Nos. 13, 25, 54, 111, 162, 166, 167, 273, 300 (various motions to withdraw filed by defense counsel over the history of this litigation).

[5]      Michael Tew and Kimberley Tew first were appointed CJA counsel (Peter Bornstein) in December 2022. Mr. Bornstein was previously retained, but after he attempted to withdraw based on the Tews' failure to pay, he was appointed as CJA counsel. *See* ECF No. 287. Thereafter, Kimberley Tew received her own CJA counsel, and Mr. Bornstein was replaced with Michael Tew's present CJA counsel. Trial was held between February 5 and 15, 2024.

$22,987.04 to $124,989.95 *per month* in the two years the Tews received publicly funded legal counsel. *See* ECF No. 450.

o  Many of these deposits were five-figure, regular influxes from legitimate corporations. Based on this and other publicly available information, the government believes that Michael Tew was employed during this period, probably providing financial consulting work to those companies (to include the Seaport Global Asset Management, the Seaport Group, and Stephen C Smith (an individual associated with these entities); Scantech Identification Beam Tech Systems, Inc; as well as Springbig and Canna Business (entities in the cannabis space, where Michael Tew has prior experience)).

o  The account also received significant (often four figure) deposits from crypto exchanges, such as Bittrex and Bitstamp, during the same time period.

o  During the 2022-2024 time frame, this single account received more than <u>$1,212,181.27</u> in deposits.

o  Every month, most of that money disappeared, often through bank transfers or withdrawals and purchases from retailers in round-dollar amounts (which, based on prior conduct, may be bulk purchases of gift cards).

o  Focusing on the most recent of those statements (January and February 2024) reveals several interesting transactions:

   ▪  During the month of the trial (February 2024), the x8851 CU Denver account received $27,157.15 in deposits.  Within the same month, almost all of those funds were withdrawn, specifically, $27,107.99. [INV_10139-10147.]

   ▪  Deposits of note in February 2024 include two influxes of $9,337.38 and $9,728.93, received on February 5 and 7 (the first and third days of trial). Both of these deposits originated from Bitstamp USA Inc., a cryptocurrency exchange.

   ▪  Almost all of those funds were withdrawn within a matter of days (again during the course of trial itself). The government does not know the destination of those funds at this time; however, it notes that each deposit is just of the $10,000 threshold that would trigger institutional reporting requirements.

- The month prior to trial (January 2024) is similarly concerning. During that month alone, Michael Tew received $91,925,67 in deposits. By the end of the month, $88,930.62 had been withdrawn. [INV_09970-09989.]

- The account was drawn down largely through a series of round dollar withdrawals, ranging from $100 to $1,500 at a time. Some of these withdrawals are to retailers known to offer gift cards (such as Walgreens, Uber Eats, Instacart, and DoorDash). This pattern is virtually identical to the Tews' past history of purchasing gift cards as a means to fund crypto speculations.

- Similarly, numerous deposits and withdrawals went through peer-to-peer transfer sites such as Apple Pay and Amazon Pay, platforms that Kimberley Tew has used in the past with money mules and crypto customers.

- Finally, the January statement shows repeated withdrawals to "Ramp" with an address at 8 The Green in Dover, DE. The government believes that these withdrawals went to Ramp.network, a crypto app that provides, *inter alia*, transfers between fiat currency and crypto.

- **Evolve Bank & Trust Records** [INV_10359-10417]:

  o This spreadsheet and the supporting documents summarize transactions of a bank account held by Kimberley Tew with Evolve Bank & Trust, a digital bank.

  o Between approximately June 2023 through December 2023, the account received over $142,000 in deposits. The majority of the deposits were from peer-to-peer transactions from services such as Apple Cash, PayPal, Metapay, and CryptoHub.

  o Those funds appear to were rapidly transferred out in order to purchase cryptocurrency, as well as sent to a personal account held by Kimberley Tew at Stride Bank.

- **Chime Card (Stride Bank) Records** [INV_10433]:

  o Stride Bank provides banking services for Chime, a financial technology company where Kimberley Tew holds or has held a debit or credit card. Stride provided records showing that, between March 2023 and February 2024, Kimberley engaged in similar transactional activity in

this account. Specifically, between March 2023 and February 2024, the records show an influx of approximately $36,000 worth of deposits, in the form of visa money transfers, other peer-to-peer transfers, and deposits from crypto exchanges. The same amount of money was transferred out to various crypto exchanges. [*See* "summary" tab.]

- **Block, Inc. (CashApp/Square) Records** [INV_09582]:

  o Block, Inc. is the corporate entity that runs CashApp, a popular peer-to-peer service that allows individuals to send money to one another, as well as Square. Block, Inc. and its entities also provide services to buy, sell, send, and receive cryptocurrency. The spreadsheet received from Block summarizes transactions for an account held in Kimberley Tew's name between January and March of 2022.

  o It shows that Kimberley Tew's CashApp account was linked or attempted to be linked to at least three credit or debit cards held with multiple financial institutions during this brief time period.

  o In a less than two week period in March 2022, Kimberley Tew's CashApp account and a bank account held in the name of Michael Tew attempted $8,460 worth of peer-to-peer transfers.

  o Additional transfers of $9,500 were attempted between the two, but did not complete, apparently because the amounts exceeded CashApp's monthly transaction limit.

  o Hundreds of attempted transfers and transactions are reflected, including numerous purchases, transfers, and sales of Bitcoin.

- **PayPal Records** [INV_09901-09921]:

  o The PayPal records show that Kimberley Tew held an account in her maiden name (Kimberley Vertanen). The spreadsheet summarizing the account activity indicates that Kimberley's account was linked to multiple bank accounts and virtual currency accounts. [INV_09901 (Tab: "Financials").] The various "Transaction" tabs show that the account was frequently engaged in crypto trading.

  o Moreover, the accompanying documents show that PayPal flagged the account's activity, because of its tendency to transact with online gambling sites, such as stake.com and shuffle.com. PayPal also noted significant activity with crypto exchange and brokerage sites, such as coinbase.com and paxos.com.

- o PayPal also flagged transfers with other peer-to-peer payment services, such as Apple cash, where the origins of funds could not be determined, as well as other transactions of dubious origin.

- o Finally, PayPal noted that the account received payments from Raise.com, a website where individuals can sell gift cards at a discounted amount in exchange for cash. [*See* INV_09902-09921.]

- **PNC Records [**INV_09922]:

  - o PNC provided a spreadsheet that summarizes transaction activity for an account held in Kimberley's name from approximately March through July of 2022.

  - o During that four-month period, the account received over $144,853.61 of credits, the vast majority of which were deposits from peer-to-peer payment services, including Zelle, Apple Cash, Cash App, and Facebook Pay.

  - o Many of these deposits originated from Michael Tew, often multiple times within a single day. On May 12, 2022, the account received two separate deposits from Credit Union of Denver (where Michael Tew banked), which, based on the amounts, appear to have been structured to avoid the $10,000 reporting requirement.

  - o During the same four-month period, the account was drawn down via near-daily transfers to cryptocurrency exchanges, such as zerohash.com and crypto.com, to the tune of $116,946.71.

- **Robinhood Records** [INV_09923-09951]:

  - o The records provided by Robinhood show that Michael Tew and Kimberley Tew each held brokerage accounts between January 2018 and August 2023.

  - o The Know Your Customer information provided to Robinhood contains possible misrepresentations and/or evidence that may contradict what the Tews said to the courts in their CJA-23 affidavits. For example, Kimberley stated that she had 4 dependents (rather than 2), and she stated that she was employed as a "consultant" for Sand Hill LLC (Michael Tew's company which was used in the charged fraud). She listed her income as being $200,000-$499,999 per year; her cash and investments as being between $50,000 - $99,999; and her total net worth

as being between $100,000 - $249,000.

- o For his part, Michael listed no dependents, but stated that he was employed as a financial planner advisor with "Seaport," which matches the regular deposits into his CU Denver account. He did not provide further specification regarding his assets.

- o In a pattern which is all too familiar, both accounts show substantial peer-to-peer and crypto transactions.

- **ZeroHash Financial Records** [INV_009952]:

- o Based on some of the other records received, it is clear that Kimberley Tew has held accounts with ZeroHash, a company that boasts business-to-business brokerage and crypto trading.

- o According to the spreadsheet of records received from ZeroHash, the company's AML department flagged transactions with their company as well.

## III.   Legal Standards for Determining CJA Eligibility

The Criminal Justice Act of 1964, 18 U.S.C. § 3006A, is the federal vehicle providing for the appointment and payment of counsel for certain criminal defendants. *See also United States v. Gonzales*, 150 F.3d 1246, 1265 (10th Cir. 1998). Its purpose is to protect the right to counsel by assuring that every defendant, regardless of his or her ability to pay, receives the benefit of a competent defense. *United States v. Parker*, 439 F.3d 81, 90 (2d Cir. 2006) (citing *United States v. Barcelon*, 833 F.2d 894, 896 (10th Cir. 1987)).

The Act's funding is not limitless. In order to protect the source of that funding from abuse — and by extension — to ensure the availability of such funding for those that truly need it, the court must conduct an "appropriate inquiry" into whether the defendant is "financially unable to obtain counsel." 18 U.S.C. § 3006A(b); *see also*

*Barcelon*, 833 F.2d 894, 896-97 (10th Cir. 1987). That inquiry is shaped by two governing principles:

*First*, under the Act, the defendant bears the burden of persuading the court that they are unable to pay for their own counsel. *Barcelon*, 833 F.2d at 898 (citing cases); *see also United States v. Anthony*, No. 15-CR-126-C-5, 2018 WL 1866614, at *2 (W.D. Okla. Mar. 29, 2018) (noting that the Tenth Circuit has not decided the precise standard of review for defendant's burden, but applying a preponderance of the evidence standard).

*Second*, the inquiry is not a static one. Rather, the Act charges the court with an *ongoing* obligation to inquire about a defendant's ability to pay throughout the lifespan of the proceedings.[6] 18 U.S.C. § 3006A(b)-(c); *see also* 51 A.L.R. Fed. 561 § 2(b).

Under Section 3006(c), appointment of CJA counsel may be invoked at any

---

[6]     The U.S. Court's Guide to Judicial Policy regarding the Criminal Justice Act, as well as its Model Plan for the Act's Implementation and Administration, mandates that each judicial district implement a CJA plan that includes a provision notifying defense counsel of their affirmative obligation to notify the court of changes to a client's CJA eligibility. *See* Section Vol. 7, Part A, Section 210.10.30, *available at* https://www.uscourts.gov/rules-policies/judiciary-policies/criminal-justice-act-cja-gui delines#:~:text=Enacted%20in%201964%2C%20the%20CJA,counsel%20in%20feder al%20criminal%20proceedings.

Despite this, the District of Colorado's CJA Plan does not appear to include such language. The District Plan does generally direct CJA counsel to abide by the CJA Guidelines approved by the Judicial Conference. *See* D. Colo. CJA Plan, Section (I)(B), *available at* https://cocja.wpcomstaging.com/wp-content/uploads /2019/12/ COD_CJA_Plan_Dec2019.pdf.

In any event, the docket reflects that Magistrate Judge Kristen L. Mix notified at least Michael Tew that changes to his financial status could impact his CJA eligibility and could require him to reimburse the CJA fund. *See, e.g.*, ECF No. 30.

point in the judicial proceedings, "as the interests of justice may dictate." Likewise, under Section 3006(f), if at any point a defendant is able to afford the costs or some portion of the costs of their defense, the court may direct the defendant to start paying for or to reimburse previously paid-for costs. At all times, the court's inquiry should be directed at the defendant's *present* or *current* availability to pay. *Anthony*, 2018 WL 1866614, at *3 (citing cases from the Fourth, Sixth, and Ninth Circuits).

In the typical case, most federal courts, including the courts of this district, rely on the defendant's submission of a basic affidavit (the CJA-23 financial affidavit), certified under penalty of perjury, that outlines the defendant's income and assets, as well as their obligations, expenses, and debts. If that document suggests that the defendant would be unable to afford the costs of counsel, in most instances, the court has satisfied its obligation to conduct the "appropriate inquiry" required by 18 U.S.C. § 3006A. *Barcelon*, 833 F.2d at 897 (citing cases). However, an "appropriate inquiry" "necessarily varies with the circumstances presented, and no one method or combination of methods is required." *Id*.

"[A] broad range of additional considerations" may apply where circumstances warrant. *Id*. Such considerations may include the needs of the defendant and his family, the amount posted by the defendant as bail, the expense and extent of legal services which the defendant requires, and other sources of assets, including the availability of assets from a spouse or other family member, as well as funds available through trusts, estates, IRAs, or other asset streams. *See Barcelon*, 833 F.2d at 897 n. 5 (citing cases). Likewise, the liquidity of the defendant's assets is a valid

14

consideration. *See id.* at 897-98 (citing cases); *see also United States v. Konrad*, 730 F.3d 343, 347 (3d Cir 2013) (citing Guide to Judicial Policy for principle that assets are "available" when defendant has control or discretionary use of them).

Another valid consideration is the defendant's credibility. For example, where the evidence shows that a defendant has misrepresented or secreted assets to create a false impression of CJA-eligibility, that may justify declining or discontinuing appointment. *See Barcelon*, 833 F.2d at 897 n.5 (citing *United States v. Rubinson*, 545 F.2d 951, 964 (2d Cir. 1976) (evidence of secreted assets justified declination of CJA appointment); *United States v. Binder*, 794 F.2d 1195, 1202 (7th Cir. 1986) (defendant's refusal to provide evidence of financial status in light of evidence submitted by government which suggested ability to pay justified denial of CJA payment)).

Similarly, the court may consider *how* a defendant has been using their available funds. For instance, a defendant's decision to invest their money in other opportunities, rather than paying for their own criminal defense, can undermine a defendant's CJA eligibility. *See, e.g., Konrad*, F.3d 343, 347-48 (3d Cir. 2013) (quoting *Barry v. Brower*, 864 F.2d 294, 300 (3d Cir. 1988) for principle that, "[i]n some cases, liquidation of assets may be required); *O'Neil*, 118 F.3d 65, 74 (2d Cir. 1997) (evidence of defendant's independent investments showed ability to pay).

## IV.   Application at the *Ex Parte* Hearings

Although the Tews may present revised CJA-23 affidavits at the upcoming *ex parte* hearings, the evidence provided by the government, combined with the legal

standards described above, provide a solid factual and legal basis for this Court to inquire further. The defendants should not simply be taken at their word, even if that word is submitted under pains and penalties of perjury.

Rather, should the Tews desire CJA-funded counsel going forward, they must meet their burden and prove to this Court that they truly qualify for it. The court would be well within the law and the facts to require that the Tews submit *all* of their bank statements, to include a full disclosure of their crypto holdings, to prove the current state of their assets and liabilities. The government also encourages the court to consult with the defendants' supervising pretrial officers, to determine whether and to what extent they disclosed their financial activities while under bond.

From what the government can see, Michael Tew continued to receive substantial income up through the point of trial. For example, as of the fourth quarter of 2023, Michael Tew was still receiving tens of thousands of dollars per month from companies such as the Seaport Group and Springbig. During this same period, Michael Tew also willingly received substantial deposits into his account in the form of transfers from crypto exchanges. The government does not know whether these transfers originated from Michael Tew, Kimberley Tew, her "investors," or some other third-party source, including potential new victims.

Similar to the time period when the Tews were defrauding the Victim Company, those assets were quickly diverted to other destinations. If past history is considered indicative of future conduct, those funds most likely went to locations controlled by Kimberley Tew, probably for the purpose of gambling and crypto

speculation. Even setting aside the question of the propriety of these purchases and transfers, they show that the funds in Michael Tew's account were *highly* liquid. The availability and fungibility of these assets are all things that this Court should consider when evaluating the Tews' eligibility for CJA counsel going forward. *See supra*. Likewise, to the extent that these facts call into question the Tews' prior candor to the courts and to the Tews' pretrial officers, their credibility is also a germane factor to this Court's inquiry.

Finally, the government seeks to address two arguments raised by the defendants at the status conference.

*First*, because this Court's inquiry must remain on the Tews' *present* ability to pay for counsel, requiring them to put forth evidence supporting a request for ongoing CJA funding to this Court does not put them in any sort of legal jeopardy regarding their *past* representations. *See, e.g.*, *Anthony*, 2018 WL 1866614, at *3 (noting that defendant's past dishonesty is not necessarily dispositive of present financial status).

A refusal to provide such evidence, or to put forward the requisite proof to meet their burden of showing eligibility, however, can justify denying continued appointment. *See also Parker*, 439 F.3d at 97 (quoting *United States v. Anderson*, 400 F. Supp. 2d 32, 35 (D.D.C. 2005) and the Guide to Judicial Policy for principle that, "It is the responsibility of the defendant to provide the court with sufficient and accurate information upon which the court can make an eligibility determination.")).

For example, in *United States v. Binder*, 794 F.2d 1195, 1200-01 (7th Cir. 1986), the Seventh Circuit addressed the declination of CJA funding for two

defendants. In *Binder*, the prosecution provided evidence that the defendants possessed substantial assets immediately prior to indictment and that they engaged in a "flurry of dubious financial activity" after indictment. When presented with an opportunity to account for the source or destination of their funds and valuable assets, one defendant declined to do so. The other provided "evasive and disingenuous" testimony. Under those circumstances, the Seventh Circuit decided that the lower court satisfied its obligation to conduct an "appropriate inquiry" and it affirmed the lower court's declination of CJA-funded counsel.

*Second*, to the extent that the defendants may argue at the *ex parte* hearings that requiring them to pay for their own counsel out-of-pocket going forward risks the withdrawal of their current counsel and disruptions to judicial efficiency, this Court should not be so distracted. The question of whether failing to pay counsel, in and of itself, satisfies the standard for a motion to withdraw has already been answered in this case. *See* ECF Nos. 280; 276 at 5-6 (citing *United States v. Beers*, 189 F.3d 1297, 1302 (10th Cir. 1999) and *Rophaiel v. Alken Murray Corp*, 1996 WL 306457, at *2 (S.D.N.Y. 1996)). Defendants may not manipulate the legal system and cause delay simply by refusing to pay their counsel. A motion to withdraw on that basis alone would be insufficient.

## V.    Conclusion

The Criminal Justice Act requires appropriate inquiry into whether a defendant can pay for his own legal counsel. That obligation is ongoing, and it serves the important purpose of providing CJA funds only to those defendants who qualify

for it and only for the parts of the proceedings where they qualify for it. Here, the records obtained by the government strongly suggest that the Tews have access to assets that would disqualify them from CJA funding going forward.

To be clear, it is possible that the government — with its limited information — does not understand some aspect of the Tews finances. It is also perfectly possible that the Tews' convictions, now that they are final and publicly available information, have changed or will somewhere change down the line the family's income streams. Certainly, should either defendant be detained after the hearing before Judge Domenico in April, that, too, also could change their financial status.

However, the Criminal Justice Act requires evaluation of the defendants' *present* financial status to evaluate whether they qualify for funding going forward. *See, e.g.*, *Anthony*, 2018 WL 1866614, at *2-3 (dividing eligibility analysis into three "stages" — initial appointment, continued appointment, and reimbursement — and evaluating each against *present* ability to pay). From what the government can see, at the present time, the evidence suggests that the Tews still have access to substantial resources. That income should be used to pay for their legal counsel rather than their own personal whims and frivolities. The Criminal Justice Act does not require that taxpayers front the costs of the Tews' legal expenses under such circumstances.

Respectfully submitted this 27th day of March, 2024.

COLE FINEGAN
United States Attorney

By:   */s/ Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:   */s/ Sarah H. Weiss*
Sarah H. Weiss
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Sarah.Weiss@usdoj.gov
Attorney for the Government

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of March, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to counsel of record in this case.

<u>*s/ Sarah H. Weiss*</u>
Sarah H. Weiss
Assistant U.S. Attorney
1801 California Street, Suite 1600
Denver, CO 80202
Telephone 303-454-0100
Facsimile 303-454-0402
Sarah.Weiss@usdoj.gov