```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2
    Criminal Action No. 20-cr-305-DDD
 3
    UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
    vs.
 6
    1. MICHAEL AARON TEW
 7  2. KIMBERELY ANN TEW,
 8
         Defendants.
 9
    _____
10
                    REPORTER'S TRANSCRIPT
11                   Evidentiary Hearing
12  _____
13          Proceedings before the HONORABLE DANIEL D. DOMENICO,
14  Judge, United States District Court for the District of
15  Colorado, occurring at 10:30 a.m., on the 22nd day of April,
16  2024, in Courtroom A1002, United States Courthouse, Denver,
17  Colorado.
18                       APPEARANCES
19          Bryan Fields and Sarah Weiss, Assistant U.S.
20  Attorneys, 1225 17th Street, Suite 700, Denver, Colorado,
21  80202, appearing for the Government.
22          Jason Dale Schall, Bowlin & Schall Law LLC, 7350 East
23  Progress Place, Suite 100, Greenwood Village, CO 80111, and
24  Kristen M. Frost, Ridley McGreevy & Winocur PC, 303 16th
25  Street, Suite 200, appearing for the Defendant,
```

1    Michael Aaron Tew.

2              David Scott Kaplan, Stimson LaBranche Hubbard, LLC,

3    1652 North Downing Street, Denver, CO 80203, and Jamie Hughes

4    Hubbard, Stimson LaBranche Hubbard, LLC, 1652 North Downing

5    Street, Denver, CO 80218, appearing for the Defendant,

6    Kimberely Ann Tew.

7     Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Tammy Hoffschildt, 901 19th Street,
8          Room A251, Denver, Colorado, 80294, (303) 947-1905

9                            **PROCEEDINGS**

10        (In open court at 10:36 a.m.)

11        *THE COURT:*  Good morning.  Please take your seats.

12    All right.  We are here for a hearing, the government's motion

13    for presentence detention.

14        I'm going to go ahead and get counsel to enter their

15    appearances, please.

16        *MS. WEISS:*  Sarah Weiss, appearing on behalf of the

17    government, with Bryan Fields and Lisa Palmer, from the IRS.

18        *MR. SCHALL:*  Jason Schall and Kristen Frost, on behalf

19    the defendant, Michael Tew, who is present with us in the

20    courtroom.

21        *MR. KAPLAN:*  David Kaplan and Jamie Hubbard, on behalf

22    of Kimberley Tew, who is present.

23        *THE COURT:*  All right.  Thank you.  So, let me just

24    say a few things about, kind of, where things stand, as I

25    understand it, and then we can get started.

1          First of all, you know, Mrs. Tew filed a motion over

2     the weekend.  At this point, I think what I would like is to

3     have the government file a response to that this week, if they

4     would.  I don't think I need to go over it, at this point, but

5     that's what I would request.

6          Second, while I'm thinking of it, I know that Judge

7     Prose reviewed the questions regarding the defendant's

8     eligibility for CJA counsel, found that both of the defendants

9     do, but I would point out that I -- the main justification for

10    providing multiple counsel for each defendant was preparation

11    for and conduct of the trial.  I'm not sure they need two

12    attorneys for everything from here on out.  So I will just ask

13    counsel to be careful about use of those resources, and only

14    use it when necessary.

15         As to the actual matter before us today, I will just

16    say I'm happy to hear any discussion that you have today, but

17    my general position is that I haven't seen a lot that has

18    changed from where we were at the end of sentencing -- or the

19    end of the trial.

20         I do have some concerns about -- mainly about use of

21    the Tews' income in a way that I guess could potentially

22    dissipate their ability to pay any restitution, that's probably

23    my main concern I have right now.  I don't have big concerns

24    about flight risk, although the government has repeatedly made

25    that point for years now.  They are still here.

1          I don't have any real fear of danger from either of

2     the defendants in the way I understand that's typically used in

3     the statute.  I do fear danger to some of the availability of

4     funds, I guess, if you want to put it that way.

5          I don't take well the government's suggestion that my

6     decision is based on viewing the justice system as two tiered.

7     If anything, it appears to me the government seeks additional

8     punishment, due to the defendant's financial status, and so

9     that is certainly not what I'm doing here.  I am attempting to

10    apply the standards uniformly.

11         I don't think -- well, I won't prejudge anything else

12    beyond that.  I do want to hear the parties' positions.  I know

13    the government is interested in presenting some evidence and

14    witnesses, so I will ask the government, sort of, how they

15    expect this to go, and then we will go from there.  Ms. Weiss?

16         MS. WEISS:  Your Honor, would you like a brief summary

17    of the government's argument prior to calling any witnesses or

18    I can just jump right in with the witnesses?

19         THE COURT:  Why don't you just tell me what you think

20    you want to do, sort of, logistically, first.

21         MS. WEISS:  So, the government intends to call two

22    witnesses, Seth Junker, from the U.S. Probation Office, to go

23    over the standard and special conditions that both the

24    defendants were under, and to ask him some questions about what

25    the facts are concerning their compliance with those conditions

1    and potential noncompliance with those conditions.

2        The government would then seek to call Special Agent

3    Lisa Palmer to discuss some of the bank records that have been

4    received and to highlight areas that the government is seeing

5    that's causing concern for dissipation of assets, and as it

6    relates, sort of, in the sort of a side way to this CJA funding

7    issue, and so that's what we would like to start with, and then

8    we can argue about how that plays into the 3553(a) factors.

9        *THE COURT:*  Okay.  All right.  Thank you.  That makes

10   a lot of sense to me, unless the defense has any objection.  I

11   would just think that we could proceed in that way.

12       *MR. KAPLAN:*  Your Honor, if I may make a brief comment

13   on -- as to that?  Your Honor, I'm concerned about the

14   procedural status that we're at.  I mean, I know the Court has

15   lots of leeway in terms of holding a hearing like this, but as

16   to the government's representation, to put a probation pretrial

17   services individual to discuss the compliance or lack thereof

18   of Ms. Tew, without having received any violation report or

19   anything that is suggestive that while they have been released

20   there has been some behavior that would qualify as a violation

21   of conditions.

22       That's how really I'm used to proceeding, when there's

23   a pretrial, post conviction, or supervised release complaint of

24   some sort.  And so, we're put in a position, both advising the

25   client as to, perhaps, our representations to the Court or

1   perhaps her testimony to the Court, to refute those

2   allegations.  It just seems unusual to me, to walk into a

3   hearing that I guess was really about -- well, it's probably

4   about both CJA compliance -- excuse me CJA eligibility and

5   detention, and if the government's argument is that there

6   should be detention, because they have not properly behaved

7   while on release, and putting up somebody from the probation

8   department without having received anything seems quite

9   unusual, seems like not anywhere close to the kind of due

10  process, even in the context of a violation that there is, and

11  certainly is not how we would prepare for any of those

12  allegations.

13          So, while it makes some sense, sitting where I'm

14  sitting, it's highly unusual to be confronted with what the

15  government is suggesting violations, without having ever been

16  told by the supervising authority that they are in violation

17  and being prepared to confront that.

18          You know, in terms of the government's concern for --

19  or continuing concern that I hear that they still have about

20  eligibility, it strikes me, although I understand the Court did

21  divide the two from, *Are they currently eligible* to *Whether*

22  *they have to provide restitution for the lack of eligibility in*

23  *the past*.  If that's the issue, it seems like anything to do

24  with their current eligibility has been resolved by the

25  magistrate.

1    The magistrate, in her order, as it related to Ms. Tew

2    suggested that she reviewed the eligibility of the affidavit

3    from years ago, and should there be a concern by the Court, a

4    continuing concern for some sort of use of CJA funds,

5    throughout the representation, that's not something that needs

6    to be done right now.  That could be added to what ends up

7    going to be a restitution order.  That may include, if the

8    Court finds, that prior to the original appointment of CJA

9    counsel, there was some sort of fraud.  I think that's, I

10   wouldn't say completely resolved, but certainly close to

11   resolved, having total of what appears to be something like

12   four-and-a-half hours, when you combine both defendants in an

13   ex parte hearing, in front of Judge Prose.

14        So, I guess I'm not -- I'm not endorsing the situation

15   here where without any notice of the violations, the government

16   appears to be prepared to discuss violations that we have no

17   notice of.

18        THE COURT:  All right.  Thank you, Mr. Kaplan.  So, I

19   will just say, sort of, on your second point about the ongoing

20   or prior CJA eligibility, I largely agree with you on that

21   point.  I'm not especially interested, today, in rehashing what

22   was already hashed out in front of Judge Prose.  That was the

23   point of having Judge Prose do that.  Magistrate judges are

24   almost always -- actually always, in my experience, the ones

25   who determine CJA eligibility, and so I, generally, think that

1    her decision -- I have no reason to revisit it or want to

2    revisit.  If we need to, I think we should have a separate

3    process for that.  But a lot of the issues, as you recognize,

4    overlap with one another, and so, obviously, some of the --

5    some of the evidence would be relevant and some of the

6    arguments would be relevant anyway.

7         As to hearing from the probation officer, I understand

8    the concern.  As you noted though, I think I have a lot of

9    leeway here.  I don't think the question is whether there's

10   been a violation.  I agree with you.  The fact that there

11   hasn't been any alleged violation brought to my attention or

12   yours by the probation office is a significant fact, that I

13   take into account.  I don't think that means that we shouldn't

14   hear from the probation office's position on what they've --

15   what they have observed or haven't observed.  I mean, I will

16   just tell you, having him up here in some ways provides you, I

17   think, with more process than you might otherwise.  I can talk,

18   and my staff and I do talk to probation officers about what's

19   going on in cases without violation reports, and so, if

20   anything, I think allowing you to discuss it directly with him,

21   provides you with some extra protections.

22        So I'm okay with Ms. Weiss' plan, even though I

23   understand your position.  So why don't we go ahead and follow

24   the government's suggested process.  Ms. Weiss.

25        *MS. WEISS:*  Thank you, Your Honor.  The government

PROBATION OFFICER JUNKER – Direct

1    would call from the U.S. Probation Officer Seth Junker.

2         (**PROBATION OFFICER JUNKER** was sworn.)

3         *THE WITNESS:*  Yes I do.

4         *THE COURTROOM DEPUTY:*  Please be seated.  Please state

5    your name and spell your first and last names for the record.

6         *THE WITNESS:*  Seth Junker, S-E-T-H.  Last name

7    J-U-N-K-E-R.

8                    **DIRECT EXAMINATION**

9    *BY MS. WEISS:*

10   Q    Thank you.  What is your title, sir?

11   A    I'm a United States Probation Officer here in the District

12   of Colorado.

13   Q    And how long have you held that role?

14   A    Almost ten years.

15   Q    Do you supervise Michael Tew?

16   A    I do.

17   Q    And Kimberley Tew?

18   A    Yes.

19   Q    Have you supervised them throughout the pendency of these

20   proceedings?

21   A    No.

22   Q    Can you please explain who else in your office may have

23   been involved?

24   A    So I'm the third officer the cases have changed hands with.

25   It began back in 2021, under Carlos Morales, then very brief

PROBATION OFFICER JUNKER - Direct

1   stint with Josh Roth, and I guess the other bulk was with me,

2   and then after the parties' had location monitoring, their

3   ankle monitors removed last year, in fact might have turned

4   hands to another officer during that time, and then I assumed

5   supervision again, following the end of trial.

6   Q   Could you estimate what time period you were supervising

7   the Tews?

8   A   I believe I had Michael from March of 2022 until maybe May

9   of last year, 2023.   Um ... Kimberley had her ankle monitor

10  removed prior to that, and I don't recall how long a period of

11  time, whether I kept her case.  She was under what we would

12  call low-risk supervision.

13  Q   Okay.  Did you have an opportunity to review your case file

14  before this hearing?

15  A   Very briefly.

16  Q   Okay.

17  A   I was out all of last week, and this was put on my plate

18  first thing this morning, but I was out in the field seeing

19  individuals in the community, so I had very little time to look

20  at the things.

21  Q   Fair enough.  If you would just tell us if there's

22  something that you couldn't answer today, because you have not

23  had an opportunity to review that file, that would be

24  appreciated?

25  A   Sure.

PROBATION OFFICER JUNKER - Direct

1   *Q*   Have you reviewed **Dockets 9** and **99**, which I believe I saw

2   you might have in front of you?

3   *A*   Yeah.  I printed off the Conditions Of Release, if that's

4   what you are referring to.

5   *Q*   Yes.  **Docket 9** would be the Conditions Of Release, for the

6   record, for Michael Tew, and **Docket 9** would be Conditions Of

7   Release for Kimberley Tew.

8   *Q*   Have those conditions been modified at certain points in

9   time over the course of the proceedings?

10  *A*   They have.

11  *Q*   Okay.  Were the Tews informed of the conditions in anyway?

12  *A*   Yes.

13  *Q*   And can you explain that process?

14  *A*   Yes.  They were put on again, back in March of '21, and I

15  know United States Probation Officer Carlos Morales met with

16  both of them, was assigned supervision of both of them,

17  reviewed them in detail, I think, at the office.  I went over

18  them via phone, when I took over the case two years ago.  So

19  yeah, I mean, a couple of times they have been reviewed.

20  *Q*   Okay.  And those conditions are also reviewed in open

21  court, correct?

22  *A*   Typically, the magistrate judge reads conditions

23  word-for-word.  Some judges handle things differently, so I

24  couldn't say how they were handled.

25  *Q*   Fair enough.  Could you please tell us whether or not the

PROBATION OFFICER JUNKER - Direct

1    Tews were subject to the standard conditions of not violating

2    any federal, state or local law?

3    *A*    Yes.

4    *Q*    Could you please describe the special conditions that

5    applied to, I believe, both of them --

6    *A*    Yeah.

7    *Q*    Special financial conditions, let's stick with those

8    conditions?

9    *A*    Yeah.  Would you like me to read off what they are?

10   *Q*    Please.

11   *A*    And I do believe they mirrored each other; the same

12   conditions.  Defendant's employment must be approved, in

13   advance, by the supervising officer.  Defendant shall provide

14   verification of any income or funds received.  Defendant shall

15   provide access to any financial records requested by the

16   supervising officer.  Defendant shall not commingle personal

17   and business funds.  Although, about a year ago, Mr. Tew --

18   that condition for Mr. Tew was removed, due to him -- his

19   employment and personal funds were all going into the same

20   account.

21         The defendant shall not register any business entities

22   without prior disclosure to the supervising officer, and shall

23   notify the supervising officer of the registration of any

24   business entities by any family members.

25         Defendant shall notify third parties of risks that may

PROBATION OFFICER JUNKER - Direct

1    be occasioned by his personal history or characteristics, and

2    shall permit the probation officer to make such notifications

3    and to confirm the defendant's compliance with such

4    notification requirement.

5            Defendant shall not conduct any financial transactions

6    through the financial account of any business entity not

7    previously disclosed to the supervising officer or through any

8    other individual's financial account, and the defendant shall

9    not solicit or receive money from third parties without prior

10   approval by the supervising officer.

11   Q    Okay.  Thank you.  Now, no violations have been filed on

12   either one of the Tews, correct?

13   A    Correct.

14   Q    Is it your understanding they were in compliance with all

15   of the special conditions?

16   A    Yes.

17   Q    What information did, let's start with Mr. Tew, give you,

18   to document and verify the information that's required under

19   the special financial conditions?

20   A    Yeah.  So one of the first documents we look at is the bond

21   report.  What financial disclosure was mentioned in that.  His

22   was very limited, limited assets.  I don't even think it

23   highlighted number of bank accounts and whatnot, but throughout

24   supervision, at least during the period that I had him or have

25   him, he has had one account, and he provides about quarterly

PROBATION OFFICER JUNKER – Direct

1   statements from that account to verify ongoing employment and

2   so forth.  So that's what I have known his financial, I guess,

3   record to be.

4   Q   Okay.  Two follow-up questions to that.  Did you approve

5   the employment that was reflected on those bank statements?

6   A   Yeah.  So he does consulting work, so there's different, I

7   guess, companies, he consults with, and he let's me know, you

8   know, who he is primarily working with, then I can see income,

9   funds being, I guess, transferred in, wired into the accounts.

10   I see that on the account.

11   Q   Okay.  Do you recall the institution that that account was

12   with?

13   A   No.

14   Q   Could it be Credit Union of Denver?

15   A   Oh, for his banking stuff?  Yes.  I thought you meant his

16   companies he is performing consulting work for.  Yeah, Credit

17   Union of Denver is correct.

18   Q   Okay.  Did Mr. Tew disclose any account with Robinhood

19   Financial Services?

20   A   That one I do not know of.

21   Q   Did he disclose any accounts, and I am going to call them

22   peer-to-peer payment platforms, but things like Apple Cash,

23   PayPal, Facebook Pay, any of those cash app?

24   A   No.  I haven't seen any other accounts under those names.

25   Q   Okay.  So those were not disclosed to you?

PROBATION OFFICER JUNKER – Direct

1    A    No.

2    Q    Did he ever tell you that he was engaging in financial

3    transactions using any of those services?

4    A    Yeah.  I mean, I could see moneys going to Apple something,

5    but just based on some of the transactions in the bank records,

6    but not beyond that, I don't have any further knowledge.

7    Q    Okay.  Did you inquire about that, specifically?

8    A    No.

9    Q    Okay.  Did he provide any other sources of income, besides

10   the consulting work that you mentioned?

11   A    Not that I can recall.

12   Q    Did he provide any information to you about funds that he

13   might have been receiving from say relatives or other third

14   parties?

15   A    No.

16   Q    Any from outside investors?

17   A    No.

18   Q    Okay.  Is it fair to say, Mr. Junker, under Special

19   Condition XY, that there's an obligation to notify third

20   parties of risks that may be occasioned by personal history or

21   characteristics?

22   A    Yes, that's how the condition reads.

23   Q    Special condition XAA say that the individual shall not

24   solicit or receive money from third parties without prior

25   approval by the supervising officer?

PROBATION OFFICER JUNKER – Direct

1   A    Yes.  That's how I am reading it.

2   Q    Would it be your expectation that the Tews would abide by

3   those conditions that they were receiving funds from anyone

4   else?

5   A    Yes.

6   Q    Would it be your practice to notify third parties of those

7   risks, if the Tews were not doing so?

8   A    Yeah, and that's kind of a loose one.  We certainly don't

9   want to jeopardize individual's way to earn income, but if we

10  recognize there might be some concerns with who they might be

11  working with, working for, so I guess I couldn't give you one

12  straight answer how we manage every case, um ... but in this

13  case, no, I never -- I never required that he notify companies

14  he was consulting with.

15  Q    Okay.  Would the allegations of the criminal conduct in the

16  underlying case inform that analysis of whether or not

17  third-party notification would be something that you would

18  consider?

19  A    Yeah.  I guess to some degree, but at the same time I'm --

20  while I understand the conviction, I -- I don't understand, you

21  know, everything that went into those convictions.

22  Q    Understood.

23  A    So I guess I don't have enough context to provide.

24  Q    Understood.  Let's turn now to Kimberley Tew.  What was

25  your understanding of her employment, based on the

PROBATION OFFICER JUNKER – Direct

1    representations she made to you?

2    A    Yeah.  So again, based on the initial, when someone is

3    released, we review the bond report.  I know in her report she

4    was a stay-at-home mom.  She was solely reliant on her husband,

5    Mr. Tew, and myself, nor anyone else in our office, had any

6    record of any financial accounts that she had.

7    Q    So did Ms. Tew ever disclose that she had any sort of

8    income stream?

9    A    No.  That was from the onset.  I look back, when the case

10   started, and when Officer Morales reviewed things, that she is

11   reliant on her husband, and if that were to change, she would

12   notify him, and there's been no notification to our office

13   throughout the duration of this.

14   Q    Did she provide any bank statements to the probation

15   office?

16   A    No.

17   Q    Were you aware of any holdings with a Robinhood Investment

18   account?

19   A    No.

20   Q    Were you aware of any holdings with a PNC Bank account?

21   A    No.

22   Q    How about Evolve Bank & Trust?

23   A    No.

24   Q    Chime® card slash Stride Bank?

25   A    No.

PROBATION OFFICER JUNKER - Direct

1    Q    How about peer-to-peer transfer services like Cash App,

2    PayPal, Facebook Pay?

3    A    No.

4    Q    None of those were disclosed to you?

5    A    No.

6    Q    How about exchanges where cryptocurrency can be held and

7    stored?

8    A    No knowledge of that.

9    Q    No information on accounting from anything held with say

10   ZeroHash.com?

11   A    No.

12   Q    Ramp.com?

13   A    No.

14   Q    Crypto.com?

15   A    No.

16   Q    Bitstamp.com?

17   A    No.

18   Q    FTX?

19   A    No.

20   Q    Bittrex?

21   A    No.

22   Q    How about Sutton Bank?

23   A    No.

24   Q    Coastal Community Bank?

25   A    No.

PROBATION OFFICER JUNKER – Direct

1   Q   BayPort Bank.

2   A   No.

3   Q   Chase Bank?

4   A   No.

5   Q   KeyBank?

6   A   No.

7   Q   Metropolitan Commercial Bank?

8   A   No.

9   Q   BBVA Bank?

10   A   No.

11   Q   Pathward Bank?

12   A   No.

13   Q   Are those the sorts of records or the sorts of accounts

14   that you would expect to be disclosed to you under the special

15   conditions that we have reviewed?

16   A   Yeah.  And certainly when, at the very onset, when we're

17   advised by husband and wife, one is stay-at-home, they are

18   solely reliant, we ask questions regarding that, then we're

19   just advised that, you know, they're supported by their

20   significant other, and it was left at that, from the very

21   onset, that it has not changed since.

22   Q   Okay.  So you are reliant on the representations that are

23   made to you, by the individuals that you supervise, under the

24   penalties and understanding that violating those conditions

25   could cause them problems?

PROBATION OFFICER JUNKER – Cross

1   A    Yeah.  And again, going back to when they are first

2   interviewed upon arrest or, you know, appear on summons, the

3   information we are provided, because that goes to the Court,

4   and that information is disclosed to all defendants that this

5   information to going to a Court to make a decision on regarding

6   bond and so forth, so, you know, they need to be honest.

7   Q    Okay.  And when evaluating whether or not to file

8   something, to violate someone for violating their pretrial, or

9   in this case bond conditions, after a conviction, you would

10  need to be made aware of that information, correct?

11  A    I certainly would.

12  Q    Okay.  And if indeed there were these types of records,

13  related to this -- these defendants that were disclosed to you,

14  is that something that you would need to take into

15  consideration on whether or not to violate these defendants?

16  A    Yeah.  Post verdict, trial for the type of convictions, I

17  guess they face, that would be pretty concerning from our

18  vantage point.

19       MS. WEISS:  Thank you very much.  No further

20  questions, at this time, Your Honor.

21       THE COURT:  All right.  Thank you.  Mr. Schall.

22                      **CROSS-EXAMINATION**

23  BY MR. SCHALL:

24  Q    I apologize, is it Junker, German?

25  A    Correct, soft J.

PROBATION OFFICER JUNKER - Cross

1   Q   Got it.  Thank you.  Your testimony was that you are

2   familiar with the file from now years, but you haven't done

3   much homework this morning?

4   A   Correct.

5   Q   But can you state whether Michael Tew has ever failed to

6   appear for court or for meeting with your office or anything of

7   that sort?

8   A   No.  I have had no issues, from a compliance standpoint,

9   with him.

10  Q   And that issue about the commingling in his bank account,

11  that is something that was kind of in the open with Michael and

12  probation trying to get resolved?  That -- would you agree with

13  my characterization that it got delayed, because of changes in

14  attorneys and things like that?

15  A   Yeah, possibly, or I guess maybe it wasn't addressed at the

16  onset, previous officer, but it was something that I caught,

17  and just wanted to make sure it was clear, and that's when I

18  raised it with him and we got it resolved.

19  Q   And not something that you -- huge red flag for you?

20  A   No.

21  Q   And he -- when I refer to he, Michael Tew, of course, he is

22  working?

23  A   Yes.

24  Q   And he makes what I would say is good to great income, as

25  far as you know?

PROBATION OFFICER JUNKER - Cross

1  *A*  Yes.  I would character --

2  *Q*  Makes more than most of us in this room do, right?

3  *A*  Yes.

4  *Q*  And has he provided, do you know, copies of consulting

5  agreements, those kinds of contractual things that form the

6  basis of his income?

7  *A*  I don't receive those.  I don't know that I have

8  necessarily asked if I can see that and he let's me know who he

9  is consulting with, and I can see that on the statement.

10  *Q*  And it matches the company the income?

11  *A*  Sure.

12  *Q*  You have made -- well, maybe you haven't.  Have you been

13  out to their apartment, at all?

14  *A*  Yes, several times.

15  *Q*  Any concerns related to them -- to Michael fleeing?

16  *A*  No.

17  *Q*  Any concerns related to him being a danger to himself?

18  *A*  No.

19  *Q*  To his children?

20  *A*  No.

21  *Q*  To the community at large?

22  *A*  No.

23  *Q*  Have you reviewed the bank account records that he, as you

24  said, submits quarterly, whatnot?

25  *A*  Yes.

PROBATION OFFICER JUNKER - Cross

1  *Q*  Do those look busy to you?

2  *A*  They are busy, yes.

3  *Q*  There's a lot of transactions?

4  *A*  Correct.

5  *Q*  Have you ever asked Michael what's going on here?

6  *A*  No.  I mean, nothing has really stood out.  I mean, from

7  time to time there might be something that I just -- doesn't --

8  I guess doesn't make sense, but if I'm not seeing a pattern of

9  something and everything else seems to be going well, I don't

10 want to blow things out of proportion.

11 *Q*  Steady as she goes, to the extent you can?

12 *A*  Sure.

13 *Q*  Is it fair to say the bank records you get from Michael

14 Tew's account do not look like the bank records you would see

15 in a normal Criminal Justice Act case?

16 *A*  Yes.

17 *Q*  Okay.  There's -- there's a lot?

18 *A*  There is.

19 *Q*  And it's fairly complicated?

20 *A*  Yes.

21 *Q*  And you heard that government's articulation of a couple

22 dozen financial institutions that you don't know about?

23 *A*  Correct.

24 *Q*  Do you have any reason to believe that Michael Tew is

25 associated with those institutions?

PROBATION OFFICER JUNKER – Cross

1   A    I have no reason to believe that, at this time.  No.

2   Q    Okay.

3              MR. SCHALL:  Could I have just a moment, Your Honor?

4              THE COURT:  Okay.

5              MR. SCHALL:  Nothing further, Your Honor.

6              THE COURT:  Thank you, Mr. Schall.  For Mrs. Tew.

7                          **CROSS-EXAMINATION**

8   BY MR. KAPLAN:

9   Q    Good morning.

10  A    Good morning.

11  Q    I'm going to ask some general comments, similar to

12  Mr. Schall.  So when it comes to supervising Ms. Kimberley Tew,

13  in terms of her being compliant, let's keep the financial

14  questions that you answered aside, you have had no difficulty

15  in her compliance?

16  A    No.

17  Q    In terms of the same set of questions, there's been no

18  reason to believe that you are in fear of her, fleeing from any

19  interaction you have had with her?

20  A    No.

21  Q    And that includes when you were on, I guess, and back on

22  again, correct?

23  A    Correct.

24  Q    And you have not seen, in reviewing any of the reports, to

25  the extent that you have, where other supervising individuals

PROBATION OFFICER JUNKER - Cross

1   commented on a fear that she would flee?

2   A   No.

3   Q   When it comes to the issues of danger to the community,

4   same set of questions, you haven't had any concerns about that

5   during your supervising of her?

6   A   No.

7   Q   And in reviewing any other supervising individuals, there's

8   been nothing that you have reviewed, to the extent that you

9   have reviewed anything, that indicates a concern about her

10  being a danger?

11  A   No.

12  Q   That is true, when she was off of an ankle monitor, which

13  is, I think you described it, has a low supervision

14  requirement?

15  A   Well, when she was removed from the monitor, I believe she

16  was placed on our low-risk caseload.  We were not seeing her as

17  often.

18  Q   Right.  I guess that's a better way to put it.  So she

19  ended up being moved to a low risk, during that time period?

20  There has nothing been brought to the attention of probation

21  pretrial supervision that causes concern about her fleeing or

22  being a danger?

23  A   No.  Just the danger of a conviction, to being placed back

24  on the monitor.

25  Q   And since -- and since that time, she has been compliant

PROBATION OFFICER JUNKER - Cross

1    with your requests?

2    A    Yes.

3    Q    And since that time, you haven't seen her pose a danger to

4    flee or a danger to the community?

5    A    No.

6    Q    And in regards to the questions that you were asked by

7    Ms. Weiss, having to do with the accounts, have you reviewed

8    any of those accounts?

9    A    I haven't seen anything.

10   Q    Right.  So, you don't know whose accounts -- whose name

11   those accounts are in?

12   A    No.

13   Q    You don't know what kind of transactions they represent?

14   A    No.

15   Q    You don't know whether those transactions represent

16   behavior of Ms. Tew?

17   A    No.

18   Q    Or Mr. Tew?

19   A    No.

20   Q    In terms of how they would conduct.  There were some -- let

21   me start over.  There were some of those accounts that had to

22   do with a Venmo or a PayPal.  It's not a violation to use some

23   of those to pay for appropriate expenses?

24   A    I would say that could be something we would want

25   disclosed, because that would be another account.  Again, not

PROBATION OFFICER JUNKER – Redirect

1   having any accounts from her, I don't know what exists on said

2   accounts.

3   Q   But the mere act of using those would not be, necessarily,

4   a violation.

5   A   If they are not reported, because there could be a

6   substantial amount of money in those accounts that would be a

7   concern.  Sure.

8   Q   Right.  Okay.  But if -- if -- let me ask you this, you

9   don't know what the status of those accounts are?

10   A   Or if she has them.  No, I don't know.

11   Q   You don't know if they are substantial amounts that are

12   being used to have her hair done or buying something at the

13   grocery store?

14   A   I don't know anything about her financial situation.

15        MR. KAPLAN:  If I may have a moment?

16        THE COURT:  Okay.

17        MR. KAPLAN:  Nothing further.

18        THE COURT:  Okay.  Thank you.  Ms. Weiss, any further

19   questions?

20                    **REDIRECT EXAMINATION**

21   BY MS. WEISS:

22   Q   Thank you, Your Honor.  Mr. Junker, the failure to disclose

23   the accounts, was the violation, right?

24   A   There would be, if there are accounts, but again, I haven't

25   seen them, but yes.

PROBATION OFFICER JUNKER – Redirect

1    Q   Understood.  And again, you have not seen them, correct?

2    A   Correct.

3    Q   Did not know they existed?

4    A   Don't know that they exist, correct.

5    Q   Were not told by Ms. Tew that they existed?

6    A   No.

7    Q   Were not told by Mr. Tew those accounts existed?

8    A   That is correct.

9    Q   And that's the reason why you cannot speak to the activity

10   in any of them?

11   A   Correct.

12           THE COURT:  All right.  Thank you.  Thank you,

13   officer.  Does the -- the government has another witness, I

14   understand?

15           MS. WEISS:  Yes, Your Honor.  The government would

16   call Special Agent Lisa Palmer.  If I could beg for the Court's

17   indulgence to set up my screen with the TrialDirector®.

18           THE COURT:  Sure.

19           THE COURTROOM DEPUTY:  Please raise your right hand.

20       (**SPECIAL AGENT PALMER** was sworn.)

21           THE WITNESS:  I do.

22           THE COURTROOM DEPUTY:  Please be seated.  Please state

23   your name and spell your first and last name for the record.

24           THE WITNESS:  My name is Lisa Palmer, L I S A, P A L M

25   E R.

SPECIAL AGENT PALMER – Direct

1                          **DIRECT EXAMINATION**

2      *BY MS. WEISS:*

3      *Q*    Good morning, Ms. Palmer.  How are you today?

4      *A*    I'm doing well.  How about yourself?

5      *Q*    Doing just fine.  A few questions for you, and I apologize,

6      get to the right page again here.

7             Were you the primary investigator in the criminal case

8      against Kimberley and Michael Tew?

9      *A*    I was.

10     *Q*    That was tried earlier this year?

11     *A*    I was.

12     *Q*    Are you familiar with the facts of that investigation?

13     *A*    I am.

14     *Q*    Okay.  And can you tell us, in broad strokes, because we

15     are focusing on financial activity today, what the summary of

16     the financial activity was in Mr. and Mrs. Tew accounts during

17     the period in question, for the charged offenses?

18     *A*    You are referring to the period for approximately 2018 to

19     2020.

20     *Q*    I am?

21     *A*    During that period, Mr. and Ms. Tew used a series of real,

22     and I will call them fake, in that they did not represent real

23     companies, to send false invoices to a victim company.  Those

24     funds either went into accounts controlled by associates of the

25     Tews or into bank accounts controlled by the Tews.  The total

SPECIAL AGENT PALMER - Direct

1    dollar value of the fraud was approximately $5 million through

2    2018 through 2020.

3    Q   Okay.  Did the Tews have multiple bank accounts during this

4    time period?

5    A   They did.

6    Q   And did the use of multiple bank accounts, was that part of

7    how the fraud was concealed?

8    A   Yes.

9         MR. KAPLAN:  Your Honor, we spent two weeks going over

10   this information.  I mean, she can make the argument, I think

11   the Court and everybody in the room knows the circumstances of

12   this -- this offense.

13        THE COURT:  Yeah, I was here.  You can probably skip

14   some of it.  Thank you.

15        MS. WEISS:  Yes, Your Honor.  I'm trying to hit the

16   highlights, in the records we will be looking at today.

17        THE COURT:  Thank you.

18    Q   (By Ms. Weiss) Multiple bank accounts were issued?

19   A   Yes.

20   Q   Correct.  In different names?

21   A   Yes.

22   Q   And was the use of bank accounts in relatives' names also

23   part of this scheme?

24   A   Yes.

25   Q   Did that include Kimberley Tew's parents and siblings?

SPECIAL AGENT PALMER - Direct

1  *A*   Let me rephrase.  To the best of my knowledge, the use of

2  accounts in her family member names never received funds from

3  the victim company directly.  However, Ms. Tew did appear to

4  have access to accounts in the names of her relatives and money

5  did flow through those accounts.

6  *Q*   Okay.  Was -- what were the -- where do these funds flow

7  too?

8  *A*   They flowed to, for example, Kimberley --

9          *MS. FROST:*  Your Honor, same objection.

10         *THE COURT:*  Yeah.  Overruled.  Go ahead.

11         *THE WITNESS:*  Kimberley's father, Dennis Vertanen, had

12  an account at Navy Federal Credit Union, and we were able to

13  trace funds from the victim company, first into accounts in the

14  name of Mr. and Mrs. Tew or Global Fuel Logistics or Sand Hill,

15  and then from there it would that go into accounts, for

16  example, in Mr. Vertanen's name.  We could see surveillance

17  photos showing either Kimberley or Michael actually taking the

18  funds out of that account through the use of of ATM cards.

19      *Q*   (By Ms. Weiss) Were peer-to-peer payment services

20  part of the scheme, as well?

21  *A*   They were one of the ways that the funds were ultimately

22  disposed of.  So, again, proceeds from the fraud went through

23  peer-to-peer platform, such as PayPal, that would probably be

24  the main one, at the time of the conduct in question.

25  *Q*   Okay.  What was your understanding of what those funds were

SPECIAL AGENT PALMER – Direct

1  used for by the Tews, ultimately?

2  *A*  It varied.  I will be transparent and say we didn't have a

3  complete understanding of this particular aspect of their

4  financial picture.  We do understand that some of the funds

5  were to support Ms. Tew's family, but some of it also appears

6  to be part of the need for cash, and some of it, on occasion,

7  Ms. Tew would direct her friends or colleagues to send funds to

8  accounts in her mom's name as a PayPal, that Ms. Tew would have

9  access to and used as part of gathering crypto or other

10 expenses.

11 *Q*  So you just mentioned other parties, that might be what we

12 refer to in our jargon as money mules?

13 *A*  I'm not entirely sure money mules would be perfectly

14 appropriate here, but I don't think that's the worst analogy.

15 I just don't want to call it that without a little bit more

16 proof behind me to say that completely.

17 *Q*  Okay.  But fair to say, there was funds that flowed through

18 other individuals and then into the Tew's accounts as a way to

19 put a distance of layer?

20 *A*  Yes.

21 *Q*  Okay.  In early 2024, did agents start receiving records

22 from various financial institutions and other institutions

23 related to the Tews' finances?

24 *A*  Yes.

25 *Q*  Could you summarize what type of records were received?

SPECIAL AGENT PALMER – Direct

1  *A*   It was a variety of records.  We received account opening

2  documents, supporting documentation for that.  So say, initial

3  bank account application, as well as proof of identification to

4  go along with it.  We received financial transactions,

5  sometimes in the form of statements, sometimes in the form of

6  spreadsheets, detailing what had transpired in an account,

7  sometimes they included additional research, performed by the

8  financial institution, to understand what they were looking at.

9  This is especially common in cryptocurrency providers.  They

10  might do some tracing to figure out, say, where funds are

11  coming from and where they're going.

12  *Q*   Okay.  How does crypto come into the underlying conduct

13  from the criminal trial?

14  *A*   It appears a lot of a large portion of the funds that were

15  received from the victim company, were ultimately converted to

16  cryptocurrency, and frequently sent to gambling websites,

17  that's probably the main point.

18  *Q*   Okay.  And who engaged in gambling in this case?

19  *A*   To the best of our understanding it was Mrs. Tew,

20  primarily.

21  *Q*   Was Mr. Tew for lack of a better word facilitating that

22  behavior by providing funds to gamble away?

23  *A*   Yes.

24  *Q*   And I apologize in advance, I'm not as sophisticated as

25  Ms. Ortiz with ... TrialDirector®.

SPECIAL AGENT PALMER – Direct

1          THE COURT:  You only have to impress me, which is not

2     as daunting as a jury, so that's okay.

3          MS. WEISS:  We will see if I can get to the right

4     page, at some actual point in time.

5     Q    (By Ms. Weiss) Thank you.  Okay.  Special Agent

6     Palmer, we have in front of us what's been marked for this

7     hearing as Government's Exhibit 2, which I would enter into

8     evidence for these proceedings.

9          THE COURT:  Okay.

10         (Government's Exhibit 2 is admitted.)

11    Q    (By Ms. Weiss) What are these records?

12    A    They are bank statements from Credit Union of Denver, for

13    accounts held in the name of Michael Tew.

14    Q    Was Kimberley Tew on this bank account?

15    A    She was not a signer on this account.

16    Q    Were there, in fact, two accounts with this credit union?

17    A    Yes.

18    Q    Can you explain the distinction between those two accounts?

19    A    At most credit unions the way it works, you will be given a

20    membership number, and then you will have subaccounts.  In this

21    case I believe it's like one checking account and one savings

22    account.  They will have the same number, which is usually the

23    membership number and then followed like by a dash 01 for

24    checking account, dash on 07 for savings, something along those

25    lines.

SPECIAL AGENT PALMER – Direct

1  Q   Okay.  And what were the two types of accounts held by

2  Mr. Tew with the Credit Union of Denver?

3  A   I believe they were called checking and sharing, but it was

4  a checking account and a savings account.

5  Q   Okay.  Does Prime Share sound correct?

6  A   Yes.

7  Q   That's ending in dash 00, as the designation?

8  A   I believe that's correct.

9  Q   And a savings account, which ended in dash 06?

10  A   Yes.

11  Q   I want to direct your attention, we're starting, for the

12  record, on INV_9737.  Can you tell us what time period this

13  account statement covers?

14  A   This is the first page of the statement covering November

15  2022.

16  Q   Okay.  And when did the Tews obtain CJA representation?

17  A   I believe it was in November 2022.

18  Q   November/December 2022 sound about right to you?

19  A   Yes.

20  Q   I want to just look at one of these months as, sort of,

21  indicative, and then we will talk about some of the other

22  activity that you have seen, over the course of your

23  investigation.

24       So, looking first at the starting balance of this, 00

25  Prime Share account, at the beginning of the month, what was

SPECIAL AGENT PALMER - Direct

1   that?

2   A    It's $9505.30.

3   Q    Okay.

4        MS. WEISS:  I apologize, everyone.

5        MR. FIELDS:  Do you want me to do your exhibits for

6   you?

7        MS. WEISS:  Do you mind?  I hate TrialDirector®.

8   Thank you, Bryan.

9        Q    (By Ms. Weiss) Exhibit 2, INV_9737, do we see

10  significant deposits on this first page?

11  A    We do.

12  Q    Okay.  If we could look -- actually, those are all

13  withdrawals.  So, if we could look down to about six lines from

14  the bottom, Bollinger Motors.  Okay.  What does this appear to

15  be to you, Ms. Palmer?

16  A    It appears, since it says W slash I, to be an incoming wire

17  from Bollinger Motors in the amount of $10,000.

18  Q    Is it your understanding this is income from that Mr. Tew's

19  consulting work?

20  A    Yes.

21  Q    If we could scroll back up to the entirety of the page, and

22  look at the withdrawals that were going on?

23        Do you see money being paid for typical living

24  expenses on this page of the bank statement?

25  A    Um, I see a handful, Starbucks, maybe transfers to the

SPECIAL AGENT PALMER – Direct

1  shares account, so I wouldn't know what that was.  Looks like

2  there's Costco, but a lot of it appears to be what I would

3  describe as peer-to-peer platform Apple Cash, we have Zelle,

4  just as an example, and Revolut, which can be used for a

5  variety of things.

6  Q   Okay.  So, one line down is a reference to Courtney

7  Vertanen.  Who is that?

8  A   That's Courtney's sister -- excuse me -- Ms. Tew's sister.

9  Q   Transfer to shares, that indicates the other Credit Union

10  of Denver account, correct?

11  A   Correct.

12  Q   And so all of those transfer to shares we should see in the

13  bank account statement for the other part of the accounts held

14  with C.U. of Denver?

15  A   Yes.

16  Q   Okay.  And you did mention there's a Starbucks, but is it

17  for a round-dollar amount or non-round amount?

18  A   It does look like it's for a round-dollar amount.

19  Q   Is that similar to previous transactions that we saw in the

20  underlying trial?

21  A   I'm not sure I understand the question.

22  Q   Did we see behavior where the defendants were purchasing

23  round-dollar amount figures at various retailers?

24  A   Yes.

25  Q   And what was the purpose of doing that?

SPECIAL AGENT PALMER - Direct

1   A   In those cases it was for gift cards, to be converted to

2   other forms of currency.

3   Q   How are gift cards converted into other forms of currency?

4   A   There are both independent I will call them brokers, as

5   well as peer-to-peer platforms such as Paxful, where you can

6   simply put up different things such as gift cards for sale, in

7   order to convert to either crypto or to cash.  Paxful

8   specializes in converting various things to and from crypto

9   from fiat to crypto, from crypto to gift card and vice versa.

10  There are other places that you can sell gift cards for cash.

11  Q   Okay.  And are these peer-to-peer payment services, like

12  Apple Cash, another way to transfer fiat currency from a

13  traditional bank account onto a crypto exchange.

14  A   Depends on the platform.  Apple Pay, I'm not familiar with

15  their crypto.  I don't think they have crypto services, but

16  Cash App does, where you can send somebody -- you can either

17  add the funds to your own account and then convert it to crypto

18  that way or you can send it to another person using their Cash

19  App handle, and then they will convert it to crypto or you can

20  send them crypto directly.

21  Q   Can we look at the next page of this same bank statement?

22  And I want to focus in on a -- the fourth transaction down.

23  West Realm Shire.  Prior to -- on about November 2, 2022, the

24  balance in the account looks to be about $10,000; is that

25  correct?

SPECIAL AGENT PALMER – Direct

1    A    Based on the transaction, yes.

2    Q    Okay.  And was there a significant withdrawal, at that

3    time?

4    A    There was.

5    Q    And what was that withdrawal to?

6    A    So, W slash O, wire out, to West Realm Shire.  Based on my

7    research that is the entity that FTX had American customers

8    send money to.  FTX was a large cryptocurrency exchange that I

9    think was the largest or one of the largest at the time of this

10   bank statement.

11   Q    Okay.  And so after that, $8600 is wired out to the West

12   Realm Shire, what is the balance on the count?

13   A    It's $1,443.30.

14   Q    Okay.  And then, scrolling back out to this.  We're seeing

15   some transactions that aren't round-dollar amount figures

16   correct?

17   A    Yes.

18   Q    But a number that are?

19   A    Yes.

20   Q    And are some of those to various retailers?

21   A    Yes.  I think we have got a Target in there.  There's a

22   William -- Sherwin Williams.  Normal retailers, I would say.

23   Q    In your training and experience, is it typical for multiple

24   transactions to retailers like this to come out to round-dollar

25   figures?

SPECIAL AGENT PALMER - Direct

1   A    Not unless you are purchasing gift cards.  We have talked

2   about that.  Or doing other things, where maybe you are, you

3   know, buying a gift card for a friend.  Having a money order or

4   something like that is unusual.

5   Q    If we can move to the next page, as well.  And about three

6   lines in, do we see a significant deposit, once again, during

7   the month of November 2022?

8   A    Yes.

9   Q    What is that?

10  A    Wire in from Seaport Calibre for $10,000.

11  Q    Okay.  And does this account get dissipated over the rest

12  of this page -- or that deposit?

13  A    Mostly, yes.

14  Q    Okay.  And can you just give us a broad description of how

15  it was dissipated?

16  A    So, we do see a number of Apple Cash sent.  So, if you look

17  towards the middle of the page, for example, we have an Apple

18  Cash sent in the amount of looks like... I struggle.  These are

19  always super fun to read.  I believe that one is $900 to Apple

20  Cash.  Later we have another 900.  We have it sent to the

21  shares account, but it mainly goes out via peer-to-peer

22  transfers, or either transfers to the share account.

23  Q    Okay.  We can move on to the next page.  Do we see a

24  another significant deposit around the 18th of the month?

25  A    We do.

SPECIAL AGENT PALMER - Direct

1   Q   And how much was that for?

2   A   That was $10,000 from Seaport Global.

3   Q   And were there several larger withdrawals immediately after

4   that income, that paycheck, hit this bank account?

5   A   Yes.

6   Q   Who did those go to?

7   A   One went to Courtney Vertanen through Zelle, I believe.

8   Q   And what was the amount of that transfer?

9   A   It was $5,700.

10  Q   And again, who is Courtney Vertanen?

11  A   Mrs. Tew's sister.

12  Q   Okay.  And in the remainder of what Mr. Fields has kindly

13  blown up for me, are we seeing more of these round-dollar

14  figures using peer-to-peer payment services?

15  A   Yes.

16  Q   Towards the bottom of this page, do we also see, again,

17  some of these round-dollar figure purchases to various

18  retailers Southwest and Dazbog?

19  A   Yes.

20  Q   And by the end of this month, November 30th, 2022, that 00

21  Prime Share account, what was the balance?

22  A   It believe it was $5.02.

23  Q   And again, is that the month before the Tews received CJA

24  counsel?

25  A   Yes.

SPECIAL AGENT PALMER – Direct

1   Q   If we could move on to 9741.  Is this the beginning of the

2   statement relating to the other account held with C.U. Denver,

3   the 06.  I believe it's called a checking account?

4   A   Yes.

5   Q   Okay.  And again, whose account was this -- whose name is

6   on this account?

7   A   Michael Tew's.

8   Q   Okay.  Only Michael Tew?

9   A   Only Michael Tew.

10  Q   Okay.  This basic checking account hopefully, at least, has

11  a summary at the top?

12  A   Yes.

13  Q   Can you please explain to us what the beginning balance of

14  this account was?  The activity as it's summarized here and the

15  ending balance?

16  A   The beginning balance on the account was $1,141.79.  It

17  received $45,332.10 in deposits.  Checks were written for $250,

18  and then there were assorted other debits or withdrawals from

19  the account for $42,819.67.  The ending balance was $3,404.22.

20  Q   Okay.  And the previous bank account that we looked at, the

21  00 Prime Share account, I believe we looked at three $10,000

22  deposits, correct?

23  A   Yes.

24  Q   And so, much of that appears was transferred into this

25  checking account?

SPECIAL AGENT PALMER – Direct

1   A    Yes.

2   Q    Okay.  But the deposits here are greater than $30,000,

3   right?

4   A    Correct.

5   Q    Okay.  So, were there other sources of income that were

6   coming into this account, besides just simply transfers from

7   Prime Share?

8   A    I believe we also saw a fair amount of peer-to-peer

9   deposits into this account in this month.

10  Q    Okay.  Let's flip forward, and I would like to go to page

11  9742, and look at about the first half of the page.

12       Can you summarize what we're seeing here, in terms of

13  the bank account activity, in the checking account, from

14  November 1st -- actually, just on November 1st.  All in one

15  day?

16  A    Sure.  So, the first transaction, and I apologize for

17  smudging up your screen, transfer to draft account.  We send

18  out Apple Cash, 900... and my screen just went blank.

19       THE CLERK:  That was me.  I just turned on the

20  annotation.

21       THE WITNESS:  That's just me following with my

22  fingers.  I shouldn't be marking anything up.

23       We see more Apple Cash going out.  We see some

24  transfers into the account.  Then we see more Apple Cash going

25  out, and more transfer into the account, and then transfers

SPECIAL AGENT PALMER – Direct

1    between the two accounts, and then more Apple Cash going out,

2    and we end with an ATM withdrawal.

3         Q    (By Ms. Weiss) Okay.  And so is it fair to say we're

4    seeing transfers from Michael Tew's account, where he is

5    receiving his payment from his consulting jobs, being

6    transferred into a checking account, and then immediately

7    transferred out using Apple Cash?

8    A    Yes.  That's my understanding of these records.

9    Q    Are there other occasions in this particular –– the bank

10   statement where we see money being transferred to Kimberley

11   Tew's relatives, the Vertanens?

12   A    Yes.

13        MS. WEISS:  Can we turn to 9744?  And if we can look

14   at the middle of the page, just under Chipotle purchase.  And

15   actually I need one more line above.  Thank you, Mr. Fields.

16   Q    Okay.  Do we see places where there are again round-dollar

17   amounts being spent at retailers, and also Facebook Pay, in

18   this instance, transfers to Kimberley Tew?

19   A    Yes.

20   Q    Okay.  And then farther down do we see a deposit of just

21   short of $500, 492.50?

22   A    Yeah.  I believe that deposit is coming from the share

23   account.

24   Q    Okay.  And does that come out again?

25   A    Yes.  They withdraw.  It appears to be withdrawn in cash,

SPECIAL AGENT PALMER – Direct

 1   as an ATM withdrawal that day.

 2   Q   And then, finally, if we can go to 9745.  And if we can

 3   look at the larger transactions in the middle.

 4        Are we seeing influxes of cash into this checking

 5   account from Facebook Pay?

 6   A   I believe that's what it is.  Yes.  We have the Facebook

 7   pay for 1900, 1800, 1700, and a wire out for $5,000.

 8   Q   Are we seeing a pattern of taking funds from using

 9   peer-to-peer payment services, and moving them around and them

10   being... disappeared?

11   A   Yes.

12   Q   If we could go to 9748.  Again, we're just going to look at

13   the top half of this.  On November 16th, 2022, was there a same

14   pattern of behavior where we see transfers coming in from the

15   shares account and immediately being sent out throughout Apple

16   Cash?

17   A   Yes.

18   Q   And was that in a series of transactions between 900 and

19   $1100?

20   A   Yes.

21   Q   Moving to to the next page, 9749.  And the final –– the

22   final line on this page.  Do we see a Zelle deposit from

23   another individual into this checking account?

24   A   So, I think what we're seeing is the 600 is coming in from

25   the draft account to cover a payment out to Courtney Vertanen.

SPECIAL AGENT PALMER - Direct

1    *Q*    Okay.  Thank you for clarifying.  These are not easy

2    documents to read.

3    *A*    The lines don't line up.

4    *Q*    All right.  And then, if we could go to 9751.  Is there a

5    payroll amount that was deposited on 11-23?

6    *A*    Yes.

7    *Q*    And does this bank statement indicate what the source of

8    that income is?

9    *A*    I believe it says Post Avenue, but I'm not entirely sure

10    what that is.

11    *Q*    And then if we could go to the next page, 9752, and the

12    very last, sort of, part of this page.

13        Is this another indication of income received by

14    Michael Tew into, at least in this case, checking account from

15    Bollinger Motors.

16    *A*    Yes.

17    *Q*    How much was that for?

18    *A*    It's $10,000.

19    *Q*    In this case it went into the checking account, not into

20    the Prime Share account?

21    *A*    Correct.

22    *Q*    If we could go to the next page.  Was a significant amount

23    of those funds withdrawn the same day?

24    *A*    Yes.

25    *Q*    And if we could just blow up that top portion.  After

SPECIAL AGENT PALMER - Direct

1    receiving that $10,000 from Bollinger Motors for Mr. Tew's

2    employment appointment, what happened that today?

3    A    Six-thousand dollars went out and then there was an $80 ATM

4    withdrawal.  It doesn't say there what the wire was for or if

5    it was a wire.  It just says the money went out.

6    Q    Okay.  That was the only bank account that you received,

7    that was in Mr. Tew's name, correct?

8    A    I do not recall.  I believe the majority of the accounts

9    were in Mrs. Tew's name, but I would feel uncomfortable saying

10   for sure that was the only account.

11   Q    Okay.  If we could look at the Robinhood records very

12   briefly, which, I believe, are Exhibits 9.  This is a personal

13   report received from Robinhood, correct, indicating that they

14   had -- report created for Robinhood Markets, Inc.?

15   A    I believe so, yes.

16   Q    Okay.  So this indicated that Mr. Tew had an account with

17   Robinhood?

18   A    Yes.

19   Q    Just while we're on.  Look at Exhibit 10.

20   A    I think the Robinhood account might have been with Mr. and

21   Mrs. Tew's name.

22   Q    There is a similar persons report for Kimberley Tew,

23   indicating there was an account in her name, correct?

24   A    Yes.

25   Q    And I believe Exhibit 8 might be a spreadsheet.  Okay.

SPECIAL AGENT PALMER – Direct

1    Were these records received from Robinhood?

2    A    Yes.

3    Q    Did they indicate that there were crypto-related

4    transaction concerns with Robinhood accounts associated in the

5    names of Michael and Kimberley Tew?

6    A    Yes.

7         MS. WEISS:   If we could now move on.   I would like to

8    go on to the PNC records.   I'm sorry, yes.   Start with PNC,

9    which is Exhibit 7.   If we could scroll to the top of this

10   spreadsheet, please, Mr. Fields.

11   Q    Okay.   These records received from PNC bank related to an

12   account filed in the name of Kimberley Tew?

13   A    Yes.

14   Q    And, essentially, it just summarizes deposits and

15   withdrawals, correct?

16   A    Correct.

17   Q    Okay.   The first part, from March 2022 to May 2022,

18   indicates deposits that were received from other institutions?

19   A    Correct.

20   Q    Okay.   Do you see any indications of structuring in that

21   portion of this document?

22   A    Probably not.   Potentially, transactions under $10,000 can

23   be indicative of structuring, but more information would be

24   needed.   We do have two deposits, it appears, on the same day

25   from the same source.   Ones is a check, the other one looks

SPECIAL AGENT PALMER - Direct

1    like an ATM deposit, but they were made the same day, so, not

2    enough information to say conclusively.

3    Q    Okay.  Moving down to the other deposits that were received

4    between March through the end of this statement.  If you can

5    just broadly summarize those, and we will just scroll through

6    them slowly.  We definitely don't need to go one-by-one?

7    A    The vast majority, at least on the screen now, appear to be

8    peer-to-peer platform, Z E L is short for Zelle from Mr. Tew.

9    He appears to be Cash App Cash Out.  We have Facebook Pay,

10   Apple Cash.  Again mostly some form of peer-to-peer payment.

11   And again, all you see here is just for the month of March.

12   Q    Okay.  And the Zelle's at least indicate who the user is

13   that's sending the money?

14   A    Correct.

15   Q    But Apple Cash does not?

16   A    Yes.

17   Q    We have no indication of who was sending that money?

18   A    Right.  And again, the vast majority of the named parties

19   are Michael Tew.

20   Q    Okay.  And this is just on a daily basis, going from March

21   through now we're into May, 2022?

22   A    And we do see some of the other names we've mentioned

23   already; Mary Vernanen and Courtney Vernanen are relatives of

24   Mrs. Tew.

25   Q    And again, these are all deposits, correct?

SPECIAL AGENT PALMER – Direct

1   A   Correct.

2   Q   Do we have the total amount of credits indicated on line

3   158?

4   A   Yes.  Between March and July 2022, it's $144,853.61.

5   Q   All going into one account, held in the name of Kimberley

6   Tew?

7   A   Yes.

8   Q   Let's look next at the debits.  Are we seeing similar –– a

9   lot of the similar, sort of, activity with peer–to–peer payment

10  companies?

11  A   Yes.  So, FB Pay, understanding that's Facebook Pay.

12  Z E L, again that's Zelle.  We do see what I will say normal

13  living expenses here, as well, with El Alamo and Door Dash,

14  things of that nature.  And if we keep scrolling down, we also

15  have a convertible virtual currency debits, where virtual

16  currency appears to have been bought using a debit card.

17  Q   So, the PNC records have completely separated out all of

18  the crypto activity from peer–to–peer activity or sort of

19  average retailer activity?

20  A   Yes.

21  Q   Okay.  And if we can look scroll just through this.  What

22  is Zero Hash?

23  A   Zero Hash is a crypto provider of some sort.  I will say

24  I'm not as familiar with them as I would say crypto.com.

25  Q   Okay.  So, we then transition from Zero Hash over to

SPECIAL AGENT PALMER – Direct

1    crypto.com?

2    A    Yes.

3    Q    Okay.  And are we seeing near daily purchases through one

4    of these platforms between March and July of 2022?

5    A    Yes.

6    Q    And did PNC total up the total amount of money, that 144

7    that was deposited into this account, that ultimately was

8    transferred out into crypto, within those four months?

9    A    Yes.

10   Q    What was that number?

11   A    It is $116,946.71.

12   Q    If we could go to Government's Exhibit 6.  Is this a

13   spreadsheet that was received from PayPal?

14   A    Yes.

15   Q    And what type of records, broadly, did PayPal provide to

16   the government?

17   A    PayPal provided, I would say, the equivalent of an

18   identification for the account, the identifiers associated with

19   it.  So on the email address tab, it's all of the emails they

20   have associated with the accounts, street addresses, phone

21   numbers.  These are all of the identifiers associated with the

22   users, and you keep going through the tabs, and it is a list of

23   also financial transactions, and they separated out crypto

24   transactions.

25   Q    And again, who are these PayPal accounts held in the name

SPECIAL AGENT PALMER – Direct

1   of?

2   A    The Tews, I believe this was primarily Kimberley Tew, but I

3   believe a couple of accounts were also in the name of Michael

4   Tew.

5   Q    Okay.  And if we just scroll down, we can see Kimberley

6   Tew's name on the summary?

7   A    Yes.  So, it looks like I misspoke.  One is in the name of

8   Dennis Vernanen.  Scroll up, there might have been a Michael.

9   Vast majority of these accounts were in the name of Kimberley

10   Tew.  There's one in Michael.

11   Q    And the one, Dennis Vernanen, who is Kimberley's father,

12   the rest of these accounts are all Kimberley Tew?

13   A    Yes.

14   Q    Okay.  Can we move forward to the crypto tab of this

15   particular document.  Do we see in -- well, first of all, I

16   suppose, what time period are these records covering?

17   A    I would have to look at all of them, but it covers at least

18   through, looks like, November 2023 is the latest date I see on

19   here, for these wallets.  All that is telling us is the date

20   these -- these wallets were created, and that the wallets were

21   updated.  It's not necessarily the financial transactions in

22   the account.

23   Q    But the wallets were created during this period?

24   A    Yes.

25   Q    So the earliest one I'm seeing is June 2023?

SPECIAL AGENT PALMER – Direct

1    A    Yes.  I think that's correct, based on what I'm seeing

2    here.

3    Q    Okay.

4    A    So, April 2023.

5    Q    And what were these accounts being used to do?

6    A    Without looking at the underlying transactions, I couldn't

7    tell you, but I could say that it looks like new wallets were

8    opened on the Litecoin, Bitcoin and a theorem blockchains

9    through PayPal.

10        MS. WEISS:  Can we move on to the transaction section?

11   Q    And are we seeing just a series of transactions that went

12   through these various PayPal accounts?

13   A    That's my understanding, yes.

14   Q    And are you seeing cryptocurrency transactions here?

15   A    Yes.

16        MS. WEISS:  And if we can sort of scroll down, and I

17   want to focus the Court's attention on columns X and Y, which

18   are the Chainalysis sources showing exposure.  Okay.

19   Q    So, if we start scrolling down, do we see notations about

20   the type of activity that PayPal was concerned was happening in

21   these accounts?

22   A    Yes.

23   Q    And what type of activity was that?

24   A    Two types kind of showed up, one is unnamed service,

25   meaning blockchain analytics don't really understand what it

SPECIAL AGENT PALMER – Direct

1   is, but it's likely a service of some sort, the other being,

2   gambling, largely to Stake.com.

3   Q   We can just scroll through to get a sense of these.  So,

4   once again, this is activity that's happening while Kimberley

5   Tew is subject to bond conditions with this Court?

6   A   Yes.

7   Q   And if we could go next to the relevant transaction

8   section.  Again, are we seeing a similar or different layout of

9   some more information reflecting the amount of cryptocurrency

10  activity that was happening, as being facilitated through these

11  PayPal accounts?

12  A   Yes.

13  Q   And scrolling, again, to the right, to see, sort of, the

14  funding source, and the Chainalysis exposure.  Are we seeing

15  multiple references to Stake.com, which is a gambling website?

16  A   Yes.

17  Q   And is that, sort of, rapid financial activity, was this

18  the sort of things we were seeing in the underlying case, as

19  well?

20  A   Yes.

21       MS. WEISS:  And if we can go to the next tab over.  I

22  believe -- I apologize.  Maybe the Speeds and Charge Back

23  section, or it might be the one past that.

24  Q   Okay.  We're now looking for the record tab marked

25  Limitations.  Does this indicate limitation notes that were

SPECIAL AGENT PALMER - Direct

1    placed on Kimberley Tew's various PayPal accounts?

2    A    Yes.

3    Q    And did those indicate PayPal having concerns about risky

4    fraudulent activity?

5    A    I am unsure what made PayPal put these in, but if that's

6    what it says, I think it's pretty -- pretty self-explanatory,

7    but I don't want to say what PayPal was thinking.

8    Q    Okay.  Did we also receive records from Evolve Bank &

9    Trust?

10   A    We did.

11        MS. WEISS:  And if we can look at those next.  Those

12   are going to be Exhibit 3.  Okay.

13   Q    Did we receive Evolve Bank & Trust records in Kimberley

14   Tew's name?

15   A    Yes.

16   Q    Okay.  And if we can scroll through, there was also a

17   report on her activity performed by Evolve Bank & Trust in the

18   spreadsheet of activity there, as well?

19   A    Yes.  My apologies, allergies.

20        MS. WEISS:  And if we can look at Exhibit 4, which is

21   going to be a spreadsheet.  I'm sorry, Bryan.

22   Q    Okay.  And again, are we seeing any Evolve Bank & Trust

23   records, a lot of the same type of activity between

24   peer-to-peer transfer services and various cryptocurrency

25   services?

SPECIAL AGENT PALMER – Direct

1   A   Yes.

2   Q   Okay.  Three lines down, what is Ramp?

3   A   Ramp is an exchange.  I don't know a ton about it.  It's a

4   cryptocurrency service provider.

5   Q   Okay.

6   A   I know it appears on some financial records as 8, The

7   Green.  It's a place to convert crypto.

8   Q   Okay.  Are you familiar with this Capital LJ, Inc.?

9   A   That one I'm actually not familiar with.

10  Q   Okay.  Any information about a Facebook user Christopher

11  BLA, does not have a full name on there?

12  A   I'm not familiar with that name, in the context of this

13  investigation.

14  Q   Okay.  But there's a credit coming in from that individual,

15  to Kimberley Tew?

16  A   Correct.

17  Q   Okay.  And similar references to various family members,

18  correct?

19  A   Yes.

20       MS. WEISS:  I want to return to Exhibit 5, I

21  apologize, which is more of the PayPal records.  It's not just

22  the spreadsheet.  All right.  If we could go to the first page

23  of this PDF.

24  Q   So, this is some of the analysis that PayPal performed on

25  the activity in Kimberley Tew's accounts, correct?

SPECIAL AGENT PALMER – Direct

1   *A*    Yes.

2   *Q*    And are they seeing examples where transfers from

3   peer-to-peer services like Apple Cash are then passing through

4   PayPal?

5   *A*    Yes.

6          *MS. WEISS:*  If we could go to the next page.

7   *Q*    We also seeing concerns about exposure for unattributed

8   addresses and clusters pertaining to the crypto?

9   *A*    Yes.

10  *Q*    Intermediary clusters sent to things like Stake.com?

11  *A*    Yes.

12  *Q*    If we can go on.  We seeing funds sent by PayPal to

13  Coinbase.com?

14  *A*    Yes.

15  *Q*    Is that a cryptocurrency exchange?

16  *A*    Yes.

17  *Q*    Are we seeing gambling entities being described on the next

18  page of this?

19  *A*    Yes.

20  *Q*    And then moving forward.  Okay.  Also seeing Shuffle.com

21  transactions?

22  *A*    Yes.

23  *Q*    What is Shuffle.com?

24  *A*    Online gambling platform.

25  *Q*    Okay.  And moving on.  Paxus.com, what type of website is

SPECIAL AGENT PALMER – Direct

1   that?

2   *A*   I believe that's exchange.  I'm not actually super familiar

3   with that one.

4   *Q*   More addresses with Stake.com.

5   *A*   Yes.

6   *Q*   We can scroll through.  Are we seeing examples where there

7   are not attribution found for where these sources of funds were

8   going?

9   *A*   Yes.

10  *Q*   Are we seeing indications of things in the six-figure

11  amount, $183,000, $130,000?

12  *A*   Yes.

13  *Q*   And so on?

14  *A*   Yes.

15        *MS. WEISS:*  And then I would like to go to the last

16  two pages of this exhibit.  And maybe one more -- well, let's

17  start here.

18  *Q*   Is there an indication -- can you read this line that says

19  received payments?

20  *A*   Yes.  Received payments from Raise Marketplace, a site

21  where individuals can sell gift cards.

22  *Q*   Can you explain how Raise Marketplace works?

23  *A*   Usually the way these platforms work is they connect buyers

24  and sellers.  Often -- say your mom gave you a Marriott gift

25  card.  There are no Marriotts in any state that you want to

SPECIAL AGENT PALMER – Direct

1    visit.  You might sell that Marriott gift card for 75 cents on

2    the dollar for cash.  That would be maybe a legitimate use of

3    that.

4           Often these platforms are used to convert one form of

5    proceeds to another form.  It's common that we find criminal

6    activity on these platforms, where gift cards are purchased,

7    maybe from scam victims or something like that, and sold for

8    cryptocurrency or for US dollars, but again, generally

9    speaking, it connects buyers and sellers on the secondary

10   market for gift cards.

11   Q   Okay.  So, maybe a way to get some fiat currency out of

12   gift cards?

13   A   Correct.

14   Q   Does it also provide a means for, perhaps, hiding the

15   source of funds, by funneling through one of these platforms?

16   A   Yes.  That's a common way the platform is used.

17   Q   Okay.  Now, I would like to next look at this Stride

18   records, which is Exhibit 11.

19          MR. SCHALL:  Your Honor, if I may, hoping for a

20   restroom break, at some point.  I just don't know how soon that

21   could be?

22          THE COURT:  Yeah.

23          MS. WEISS:  I'm happy --

24          THE COURT:  How close are you?

25          MS. WEISS:  I'm just going to hit a couple more

SPECIAL AGENT PALMER - Direct

1    highlights, maybe five, ten minutes.

2            THE COURT:  I think we can make it five or ten

3    minutes.

4            MR. SCHALL:  All right.

5            THE COURT:  If it goes much longer, I will be with

6    you, Mr. Schall, but let's go ahead.

7            MS. WEISS:  All right.

8        Q    (By Ms. Weiss) And did we receive records -- the

9    government receive records from Stride Bank --

10   A    We did.

11   Q    -- Chime® card?  Is that a fintech company?  It's just an

12   online bank?

13   A    Yes.

14   Q    Did they provide records between March of 2023 and

15   February of 2024?

16   A    They did.

17   Q    Does this indicate the account holder for this account?

18   A    Kimberley Tew.

19   Q    Okay.  And if we look at this summary of -- the summary tab

20   for this Exhibit.  Do we see summaries of a significant amount

21   of Apple Cash, peer-to-peer and crypto activity in this

22   account?

23   A    Yes, we do.

24   Q    And is that consistent with some of the other documents

25   that we've seen here?

SPECIAL AGENT PALMER – Direct

1    *A*    Yes.

2    *Q*    Okay.  Did they flag about $36,000 worth of activity in

3    that account?

4    *A*    They did.

5    *Q*    And then if we could look at Exhibit 1, which is the Block

6    records.  What services does Block Incorporated own?

7    *A*    Block is a parent company of Cash App.

8    *Q*    Is Cash App yet another peer-to-peer transfer?

9    *A*    Yes.  They also allow verified users to engage in Bitcoin

10    transactions.

11    *Q*    Okay.  And we were seeing similar concerns or records being

12    provided to us from Block?

13    *A*    Yes.

14    *Q*    Okay.  And then finally, Zero Hash, which is Exhibit 12.

15    And what is Zero Hash?

16    *A*    Zero Hash is a service provider in the crypto space.  I

17    will confess I'm less familiar with them.  I think they might

18    provide a debit card, but I do not recall.

19    *Q*    Okay.  And Zero Hash is one of the companies that we saw in

20    the PNC records.  The deposits going in and then going out to

21    Zero Hash?

22    *A*    Correct.

23    *Q*    Zero Hash records are, essentially, the other half of that

24    transaction, that indicates there was significant

25    cryptocurrency activity, by Kimberley Tew, through this

SPECIAL AGENT PALMER – Direct

1    platform?

2    A    Yes.

3         MS. WEISS:   No further questions, Your Honor.   Thank

4    you.

5         THE COURT:   Okay.   Thank you.   Why don't we -- since

6    it's after noon, how about if we take like a half-hour break,

7    and we can come back and do Cross-examination.

8         MR. SCHALL:   Before that, Your Honor, sorry, could we

9    approach on an issue that we need to -- that I would like to

10   know about before the break.

11        MR. KAPLAN:   Your Honor, before we approach, I have

12   another issue.   I did not realize this was going to go into the

13   afternoon, quite frankly.   I have a court appearance in

14   Arapahoe County at 1:30.   I will speak to my office and

15   Ms. Hubbard about that to see if I can accommodate what's

16   happening now in this courtroom.

17        THE COURT:   Okay.   If you need to approach briefly,

18   why don't you, and we can talk about all that.   Go ahead.

19             (At the bench.)

20        MR. SCHALL:   I don't know a gentle way of saying this,

21   so, there are circumstances whereby I have to advise my client

22   one way, that are contrary to the interests of his spouse.   I

23   don't know what his choice would be in that matter, but I'm

24   hesitant to have that discussion with him, for fear of getting

25   fired, if I don't realistically need to have that discussion

SPECIAL AGENT PALMER - Direct

1   with him.  And what I don't want to do is ask the Court for a

2   preliminary decision, but it would be helpful to know if the

3   Court is considering the government's evidence, in light of

4   remanding clients into custody, additional conditions of

5   release, or kind of what's on the table?

6           THE COURT:  Yeah.  Okay.  I mean that's fair.  At the

7   moment, as things stand right now, I expect to be considering

8   additional conditions, not remanding anybody, at the moment.

9   Conditions that I have in mind would be something along the

10  lines of basically prohibiting anymore of what -- what's been

11  shown in all of this, all of these exhibits, going forward, and

12  requiring more affirmative disclosure of whatever is needed to

13  make sure that that's not going on.  And then if they comply

14  with that, I would be okay with that, but I mean, there's a lot

15  of evidence that's been going on and need it to stop.  So

16  that's what I'm thinking, if that helps.

17          MR. SCHALL:  That helps.

18          THE COURT:  I think I may suggest to them, and I will

19  tell you, you know, I do think some significant prison terms

20  are virtually inevitable, in this case, and to the extent that

21  they want to stagger those, someone getting started early might

22  be in their interests?  Just something to think about.  Anyway,

23  that may help for me to explain that.  That's what I'm trying

24  to get done today.

25          In terms of kind of scheduling, we could --

SPECIAL AGENT PALMER - Direct

1          MR. KAPLAN:  We just ask -- I just want to know what

2     the Court has in mind for scheduling, and we can accommodate

3     that.

4          THE COURT:  We could try to kick it out more quickly.

5     If you want to take a quick recess, come back, I don't know how

6     long Cross is expected to take, if you want longer to confer

7     with your clients --

8          MR. KAPLAN:  I'm thinking.  Plan on handling, if we

9     were to come back, given the opportunity to, about half hour,

10    45 minutes.

11         THE COURT:  Let's take like a ten-minute recess for

12    now.

13         MS. FROST:  Could I ask for reconsideration, for 15?

14         THE COURT:  Ten always turns into 15.  I'm going to

15    stick with ten.

16         MS. FROST:  Thank you, Your Honor.

17         (In open court.)

18         THE COURT:  All right.  So we're actually going to

19    take a recess, more like ten minutes from now, and then return,

20    so let's do that.  Thank you.

21         THE COURTROOM DEPUTY:  All rise.  Court is in recess.

22       (Recess at 12:12 p.m.)

23       (In open court at 12:28 p.m.)

24         THE COURT:  Please take your seats.  Counsel, can we

25    go to Cross-examination?

SPECIAL AGENT PALMER – Direct

1        MR. KAPLAN:  Your Honor, just for a moment I -- you

2   may see me leave.  No disrespect to the Court.

3        THE COURT:  I understand.  Thank you.  For Mr. Tew, is

4   there Cross-examination?

5        MS. FROST:  Yes, Your Honor.  It shouldn't take that

6   long.

7        THE COURT:  Go ahead.

8        MS. FROST:  Sorry.  Your Honor, may I have a moment,

9   Your Honor?

10       THE COURT:  Okay.

11                      CROSS-EXAMINATION

12  BY MS. FROST:

13  Q   Thank you.  Good afternoon, Agent Palmer.

14  A   Afternoon.

15  Q   We just went through a lot of financial documents?

16  A   Yes.

17  Q   For the PayPal account, for instance, you have, obviously,

18  looked at a lot of financial records, but you have no idea who

19  set up the PayPal account?

20  A   I can't say who was behind the computer, at the time.  What

21  I can say is they provided certain identifiers and claimed to

22  be one person or another, but I don't know who actually clicked

23  the button and hit submit.

24  Q   That's where I'm getting at, right?

25  A   Yes.

SPECIAL AGENT PALMER - Direct

1    Q   You don't know if it was Kimberley Tew or Michael Tew?

2    A   Correct.

3    Q   You don't have any access to Kimberley Tew or Michael Tew's

4    personal conversations, right?

5    A   No, I don't know.

6    Q   In terms of all of the peer-to-peer accounts that you

7    discussed, like Apple Pay, et cetera, same thing, right, you

8    have no personal knowledge of who is behind the computer, to

9    use your words, and set up those accounts?

10   A   Correct.

11   Q   With respect to the one bank account in Michael Tew's name,

12   you have no idea if Kimberley Tew, for instance, had access to

13   the checking account or the savings account, right?

14   A   Correct.

15   Q   And they are married, of course they could have a debit

16   card, as well?

17   A   She could have access to his debit cards.  The bank

18   probably would not have issued one in her name to her.

19   Q   She could have access to his online banking?

20   A   Yes.

21   Q   To an app on the phone?

22   A   Yes.

23   Q   And we can agree that what the evidence, in this case,

24   showed -- well, we went through a long two-week trial?

25   A   Yes.

SPECIAL AGENT PALMER – Direct

1    *Q*    We were all here, including Judge Domenico?

2    *A*    Yes.

3    *Q*    And the evidence we all heard showed that the person with

4    the gambling problem is Mrs. Tew?

5    *A*    Yes.

6    *Q*    And it's not just a problem; it's a serious addiction?

7    *A*    Um, those -- that would be my understanding with a little

8    bit of that is based on personal judgment.  I'm not a

9    psychologist or a psychiatrist and I don't want to diagnose

10   someone with an addiction.

11   *Q*    And that's fair, but I'm talking about all of the witnesses

12   that testified in the trial --

13   *A*    Yes.

14   *Q*    -- we sat in together, they all talked about Mrs. Tew being

15   the one who has an extreme gambling problem?

16   *A*    Yes.

17   *Q*    You testified about some transfers, and I am not going to

18   waste time going through all of these records.  The Court has

19   seen them.  But -- and some of these records that show

20   transfers to Kimberley Tew's sister?

21   *A*    Yes.

22   *Q*    And her father?

23   *A*    Yes.

24   *Q*    And we can agree that in those records you never see any

25   evidence there's money being transferred to Mr. Tew's family

SPECIAL AGENT PALMER – Direct

1    members?

2    *A*    Based on the names I know of Mr. Tew's family members, that

3    is correct.

4    *Q*    In your Direct Examination, today, you talked about the

5    crypto being gambled, essentially, right?

6    *A*    Some of it, yes.

7    *Q*    An in your words, Mr. Tew was facilitating Mrs. Tew's

8    behavior by providing money?

9    *A*    Yes.

10   *Q*    Okay.  And so just breaking that down, quickly.  It's

11   Mrs. Tew that's buying the crypto and going out, online and

12   gambling with it, right?

13   *A*    Accounts in the name of Mrs. Tew, that appear to be sending

14   that money.  I can't say who is pushing the button, because I

15   was not present, but I can say the accounts that were used to

16   do that were in the name of Mrs. Tew.

17   *Q*    We heard trial testimony from Mr. Meyers about this?

18   *A*    Yes.

19   *Q*    And he talked about working with Mrs. Tew.

20   *A*    Yes.

21   *Q*    He was one of the people that said Mrs. Tew has a severe

22   gambling problem?

23   *A*    Yes.

24   *Q*    In your words, on direct examination you said, Mr. Tew is

25   facilitating her behavior, right?

SPECIAL AGENT PALMER – Direct

1  *A*    To the best of our knowledge, yes.

2  *Q*    And he is doing that by providing her with money to buy the

3  crypto to engage in the gambling behavior?

4  *A*    Yes.

5  *Q*    But again, you have no idea, when you say that, right,

6  about whether Mrs. Tew is demanding that he give her the money?

7  *A*    Correct.

8  *Q*    You have no idea if Mrs. Tew is threatening Mr. Tew for the

9  money.

10 *A*    Correct.

11 *Q*    You have no idea why the money, in your review, is given by

12 Mr. Tew to Mrs. Tew?

13 *A*    Correct,

14 *Q*    Same with all of these gift cards, right?

15 *A*    Correct.

16 *Q*    Now, we know that throughout the life of this case -- well,

17 how long have you been investigating this case?

18 *A*    Two thousand nineteen, I believe.

19 *Q*    So, a long time?

20 *A*    Long time, yes.

21 *Q*    You have been on this case way longer than I have, we can

22 stipulate to that?

23 *A*    Yes, absolutely.

24 *Q*    And so you know a lot about the Tews, their finances,

25 right?

SPECIAL AGENT PALMER - Direct

1    *A*    Yes.

2    *Q*    And Mrs. Tew, you were present for the proffers, right?

3    *A*    I was.

4    *Q*    And Mrs. Tew, of course, doesn't work?

5    *A*    Mrs. Tew has worked in the past.  Throughout the duration

6    of this case, I have not found what I would call traditional

7    employment, in terms of being a salaried employee where she

8    received wages, but I'm not privy to the whole picture of their

9    finances and --

10   *Q*    Well, let me -- let's make it simple.  He is not a W -- 2

11   employee for anyone?

12   *A*    As far as I know.

13   *Q*    He is not a 1099?

14   *A*    As far as I know that's credit, but she did provide

15   services for National Air Cargo --

16   *Q*    Sure.  That was during a small sliver of all of these

17   years --

18   *A*    Correct.

19   *Q*    -- right?

20   *A*    Yes.

21   *Q*    Mr. Tew is the person that supports the family?

22   *A*    That is my understanding, yes.

23   *Q*    And you talked about household expenses you see on the bank

24   records?

25   *A*    Yes.

SPECIAL AGENT PALMER - Direct

1    Q    And there's a bunch of them, right?

2    A    Yeah.

3    Q    Ms. Tew is responsible for paying the household expenses

4    through his employment, right?

5    A    Yes.

6    Q    And, basically, every other bill, to support the family?

7    A    That is my understanding, based on what I know, but what I

8    know about the nature of their relationship is limited.

9    Q    You talked about Facebook Pay, and forgive me, because I'm

10   not on Facebook?

11   A    Smart move.

12   Q    Yeah.  All that really is, is just a way to pay someone

13   through the Facebook app, right?

14   A    Correct.

15   Q    And, of course, there's nothing illegal about that?

16   A    No.

17   Q    And there's nothing illegal about PayPal and all of these

18   other peer-to-peer payment services, right?

19   A    Correct.

20   Q    And again, you told the Court about a Facebook transfer you

21   saw, but you have no idea who is transferring that money and

22   why it's being transferred?

23   A    I think that's correct.  I would have to look at the

24   records.  Sometimes it lists a name.  I think that's mainly for

25   Zelle, but I don't know why any of those funds were

SPECIAL AGENT PALMER – Cross

1    transferred.

2    Q   Fair.  Raise Marketplace, was that the gift card website?

3    A   I believe so.

4    Q   And again, there's nothing illegal about that website?

5    A   No.

6    Q   Same with Stake.com?

7    A   Stake.com, that one is a little bit more complicated, as it

8    relates to US gambling laws, and I don't know much about that.

9    The existence of the platform is not illegal, but that's as far

10   as I'm comfortable going on that.

11   Q   Sure.

12           MS. FROST:  Your Honor, may have just one second?

13           THE COURT:  Okay.

14   BY MS. FROST:

15   Q   And, Agent Palmer, you have done a lot of work on this

16   case, obviously, since 2019?

17   A   Yes.

18   Q   But, you know, you really don't have any personal

19   knowledge, nor can you explain the relationship dynamics

20   between Mr. Tew and Mrs. Tew?

21   A   Correct.

22           MS. FROST:  Thank you.  I have no further questions of

23   Agent Palmer.

24           THE COURT:  Good.  Thank you.  For Mrs. Tew?

25                        **CROSS-EXAMINATION**

73

SPECIAL AGENT PALMER – Cross

1  *BY MS. HUBBARD:*

2  Q   Good afternoon.  Good to see you again.

3          I want to start by referencing the payments to

4  Kimberley Tew's family members.  You were just talking with

5  Ms. Frost about knowing, through the life of this

6  investigation, some about their family dynamics, right?

7  A   Limited, but yes.

8  Q   And you understand that Mrs. Tew's family is who, for

9  example, flew out to stay with the kids during the two-week

10 trial?

11 A   I actually did not know that.

12 Q   Okay.  Mrs. Tew's sister, you were not aware she was the

13 one who came and stayed in Denver?

14 A   I was not aware of that.  Other members of the prosecution

15 team may have been, but I was not.

16 Q   Okay.  And you looked -- and Mr. Tew's family, you know,

17 lives here in Denver, right?

18 A   Yes.

19 Q   You are not aware there's been any real communication

20 between the Tews and Mr. Tew's family that you aware of, right?

21 A   I know very little about the communications between Mr. Tew

22 and his family members.

23 Q   Okay.  You went through with Ms. Weiss one month, I

24 believe, of bank account statements?

25 A   Yes.

SPECIAL AGENT PALMER - Cross

1    *Q*   And those statements were all from Mr. Tew's account,

2    right?

3    *A*   Yes, that's correct.

4    *Q*   And I believe the month you all chose to look at was

5    November 2022.  Does that sound, right?

6    *A*   Yes.

7    *Q*   And you talked about a number of purchases that -- money

8    transfers, peer-to-peer transfers that went to Kimberley Tew's

9    family during that month?

10   *A*   Yes.

11   *Q*   Some Southwest purchases that month?

12   *A*   I don't believe we talked about those, but those were

13   included within that statement.

14   *Q*   You were aware that during the time period, while Ms. Tew

15   has been on pretrial supervision, that her father passed away?

16   *A*   Unfortunately, yes.

17   *Q*   And that was November 2022?

18   *A*   I did not know that date.

19   *Q*   Okay.  It was November 9th, 2022, that Mrs. Tew's father

20   died in Vermont?

21   *A*   I'm sorry.  I didn't know the date.  I'm very sorry.

22   *Q*   And so some of those purchases, you know, there was a

23   purchase for flowers in the month of November that may well

24   have been for his funeral?

25   *A*   Correct.

SPECIAL AGENT PALMER - Cross

1   Q    And the travel may well have been so Kimberley could be

2   there when he died?

3   A    I would absolutely believe that.

4   Q    Okay.  Sorry.  Ms. Frost was talking with you about --

5   well, about, you know, the fact that many of these -- having

6   accounts and trading gift cards on some of these websites,

7   nothing is illegal in and of itself about that?

8   A    No.

9   Q    And the same is true about cryptocurrency?

10  A    Correct.

11  Q    And from the time period of 2018 to 2020, all of those

12  transactions that we heard about during the the trial, the --

13  the tricky part about that is the source of funds that were

14  going through these accounts was allegedly fraudulent?

15  A    Correct.

16  Q    Right.  So all of those small trades and the accounts going

17  back and forth and buying crypto, the problem with that was

18  really that the source of funds were allegedly fraudulent,

19  which then filters down through all of those transactions?

20  A    Correct.

21  Q    And that's what makes, you know, as the jury found, at

22  least on some accounts, that's money laundering or a form of

23  money laundering?

24  A    Correct.

25  Q    Taking the dirty funds and moving it through the account?

SPECIAL AGENT PALMER – Cross

1    *A*   Correct.

2    *Q*   But if the source of funds is legitimate income, from a

3    company that is paying Michael Tew as a contractor, 1099'ing

4    him, that changes the whole analysis, right?

5    *A*   Yes.

6    *Q*   And so then transferring money between accounts isn't, in

7    and of itself, money laundering?

8    *A*   Correct.

9    *Q*   It isn't, in and of itself, illegal, right?  There's

10   banking regulation that apply to how much money and things like

11   that, but moving money between your own accounts, where the

12   source of funds is clean, isn't illegal?

13   *A*   It isn't inherently illegal, but we would need to look at a

14   transaction-by-transaction basis.

15   *Q*   Sure.  And that's why I think you were testifying with

16   Ms. Weiss, that you know, there are things that you look at, as

17   an IRS agent, that can send up red flags, but you need more

18   information?

19   *A*   Correct.

20   *Q*   Right.  So if there's one transaction for $9500, that may

21   just be a $9500 transaction?

22   *A*   Correct.

23   *Q*   And if you saw a pattern of them or series of them, you

24   might start looking at structures?

25   *A*   Correct.

SPECIAL AGENT PALMER - Cross

 1   Q   There's nothing, in and of itself, illegal about having an

 2   account on Robinhood?

 3   A   No.

 4   Q   Or PayPal?

 5   A   Correct.

 6   Q   There's nothing, in and of itself, illegal about

 7   transferring money to family members?

 8   A   Correct.

 9   Q   Technically, when they help with you your kids?

10   A   Yes.

11   Q   And when you are looking at a lengthy prison sentence?

12   A   Correct.

13   Q   And may need additional help from family members with your

14   kids?

15   A   Correct.

16   Q   Do you have kids?

17   A   I do not.

18   Q   Sorry for the personal question.  It's relevant to my next

19   question.

20   A   That's fair.

21   Q   In November, do you know that parents of kids who have

22   school-age kids sometimes buy gift cards?

23   A   Yes.  I am aware of that fact.

24   Q   For teachers, right?

25   A   Yes.

SPECIAL AGENT PALMER – Cross

1    Q    Starbucks is a hot one?

2    A    That does not surprise me.

3    Q    Okay.  So, some of those hundred-dollar gift card purchases

4    may have been for -- for the Tews' teacher gifts?

5    A    Yes.

6    Q    Okay.

7    A    They could have been.

8    Q    I mean, the fact of the matter is, I think, as you

9    testified previously, is you don't really know?

10   A    Correct.

11   Q    And you are looking at patterns and just tracing

12   transactions?

13   A    Correct.

14   Q    And we've looked, focused here today, mostly on records

15   from 2022, 2023, it seems like, right?

16   A    Yes.

17   Q    So, the investigation of the NAC proceeds, ended 2020; is

18   that right?

19   A    The last payment with NAC proceeds was July 2020, and then

20   I believe the Indictment was January 2021.

21   Q    Okay.  So, the last NAC payment was July 2020?

22   A    Correct.

23   Q    And they were indicted, I think you said, in 2021, and so

24   we're looking at records, the government has requested, from

25   banks and other financial transactions that are two to three

SPECIAL AGENT PALMER – Cross

1   years later?

2   *A*   Correct.

3   *Q*   Okay.  And the IRS is still actively requesting those

4   records and reviewing and analyzing those records?

5   *A*   Yes.  That's part of my job, as the cases move forward.

6   *Q*   Okay.  And I believe at a prior pleading it was said that

7   the IRS with -- or at the direction of or in conjunction with

8   the prosecution team, is attempting to do a full financial

9   accounting of the Tews; is that right?

10  *A*   Yes.  To the extent that it is still relevant to court

11  proceedings in the case.

12  *Q*   Okay.  So you are trying to identify where their accounts

13  are, and where their assets may lie?

14  *A*   Correct.

15  *Q*   And you are putting that information together and analyzing

16  it.  I believe most of the exhibits that we looked at today,

17  were not the records, themselves, it was kind of your analysis

18  of the records?

19  *A*   Hm, no.  Most of it was the records we received from the

20  financial institutions.

21  *Q*   Okay.  At least one of them had like screen shots from

22  Google searches?

23  *A*   Those were not searches that I performed.

24  *Q*   Okay.  Somebody on the prosecution team or someone in law

25  enforcement did that?

SPECIAL AGENT PALMER - Cross

1    A    I believe those were records from the financial

2    institutions.  I -- I would need to look at the specific

3    documents, but I believe it was what the financial institutions

4    provided.

5    Q    All right.  Never seen financial documents that have screen

6    shots and captions on them, so that was, perhaps, my assumption

7    that that was your kind of work product or someone on your

8    team's work product?

9    A    We frequently find that financial institutions, if we think

10   to ask, will provide the results from the internal

11   investigations, which sometimes includes screen shots from

12   Google, but also sometimes includes, like, website captures,

13   communications with their customers.  It can be a pretty broad

14   spread of what we get from them, actually.

15   Q    Gotcha.  So, the IRS is still, as we sit here today,

16   actively looking for accounts that might be held by the Tews?

17   A    Yes.

18   Q    And if you get additional records, you are still analyzing

19   those records to try to locate where their assets may be?

20   A    Correct.

21          MS. HUBBARD:  If I could have a minute, Your Honor?

22          THE COURT:  Okay.

23          MS. HUBBARD:  No further questions, Your Honor.

24          THE COURT:  All right.  Thank you.  Ms. Weiss,

25   Redirect?

SPECIAL AGENT PALMER – Redirect

1          *MS. WEISS:*  Just one or two, Your Honor, and I am

2    hoping I can get Mr. Fields to pull back up the laptop.  Do

3    single page of the records this way.  Okay.

4                        **REDIRECT EXAMINATION**

5    *BY MS. WEISS:*

6    *Q*    Special Agent Palmer, we were mostly looking for the

7    records just immediately prior to when the Tews received CJA

8    counsel, correct?

9    *A*    Yes.

10   *Q*    I want to take a second and look at a couple of the records

11   from more recently, since that just came up in the

12   Cross-examination.

13         *MS. WEISS:*  If we could please look at page -- it's

14   Bates marked 9880.

15   *Q*    Okay.  Is this a section of the Credit Union of Denver bank

16   statement from January of 2024?

17   *A*    It is.

18   *Q*    So, this would have been the month before trial started?

19   *A*    Yes.

20   *Q*    And are we seeing similar patterns of behavior to what we

21   were seeing in November of 2022?

22   *A*    Yes.

23   *Q*    Do we see some of these references to Ramp 8 The Green?

24   *A*    Yes.

25   *Q*    Is that the cryptocurrency companying you were referring

SPECIAL AGENT PALMER - Redirect

1  to?

2  A   Yes.

3  Q   So, we were seeing transfers out to a cryptocurrency

4  exchange from the weeks leading up to this trial?

5  A   Yes.

6       MS. WEISS:  Okay.  We can look at page 9970, and I

7  apologize for doing Bates numbers on you, Mr. Fields.  And

8  9970.  Jump ahead to 388.  I think it's easier.  We can skip

9  that one for now.  The next one is going to be Bates Stamp

10 10139.

11 Q   Okay.  Are we looking at bank account statements for the

12 Prime Share account held in Michael's name with C.U. Denver for

13 February 1st, 2024, through February 29th, 2024?

14 A   We are.

15 Q   What significant happened in the month of February 2024?

16 A   Looks like there's incoming wire from Bitstamp, about five

17 lines down, in the amount of $9,728.93, but I mean that's

18 pretty significant, I would think.

19 Q   What is Bitstamp?

20 A   Bitstamp is a virtual currency exchange room.  A place to

21 convert US fiat to crypto and vice versa.

22 Q   Was there a withdrawal two days later, in an amount almost

23 in that same amount, $9500?

24 A   Yes.  I think that went to the shares account.

25 Q   What was happening between the dates of February 7th and

1    February 9th, 2024.

2    *A*    Those were the first couple days of our trial.

3         *MS. WEISS:*  No further questions, Your Honor.

4         *THE COURT:*  All right.  Thank you.  Thank you,

5    officer.

6         *MS. HUBBARD:*  Just going to grab my phone that I

7    happened to leave up here.

8         *THE COURT:*  Go for it.  Okay.  Are those all of the

9    witnesses?

10        *MS. WEISS:*  Your Honor, we would like to call

11   Mr. Junker back.  We can either call him back to the witness

12   stand or just ask him some questions about what sort of

13   conditions may be available.  Not available.  I think it would

14   be useful to have his perspective, now that he has had an

15   opportunity to see some of this evidence, as well.

16        *THE COURT:*  Yeah.  Well first, let me just make sure,

17   are we done with evidence; is that right?

18        *MR. SCHALL:*  Yes, Your Honor.

19        *MS. HUBBARD:*  (Nodding head.)

20        *THE COURT:*  Okay.  Yeah.  So, let me just, kind of,

21   tell you, I have, sort of, indicated this a little bit, but

22   tell you my thinking of where we are, right now, regarding

23   detention.

24        I acknowledge the government's position, and it's not

25   a weak position at all, that detention is appropriate, and on

1    the other hand, I -- and it's clear that some of these

2    transactions and the type of things that have been going on are

3    concerning, in some ways.

4         On the other hand, given the statutory requirements

5    and the fact that I haven't decided on a sentence yet, and

6    can't decide on a sentence yet, the evidence I have heard, the

7    arguments I have heard, both in the briefing and the various

8    documents I have seen, haven't changed things enough, at this

9    point, for me to order either defendant to be detained right

10   now.

11        So, the discussion about potential additional

12   conditions is a worthwhile one, in my view.  I will say just a

13   couple of things, before we get, maybe, into some of the

14   details about that.

15        I guess my main concern with some of these

16   transactions is, as I said, I don't see any real flight risk,

17   at this point, and I don't see a danger in the sort of typical

18   way we consider that posed by either of these defendants, other

19   than a potential danger of dissipating or hiding some of the

20   assets that could be subject to restitution or fines or other

21   financial penalties at sentencing, and I think some of the

22   evidence here today suggests why that's a significant potential

23   concern.

24        That said, it does appear to me that given the

25   guidelines, in this case, the number of convictions, the dollar

85

1    amounts at stake, that the defendants are looking at a high

2    likelihood of significant prison sentences, and I know we've

3    talked about the family situation and the possibility of trying

4    to stagger those terms, which is a possibility, but it's not

5    easy, and it's not a certainty, and to the extent that's

6    something that the defendants wish to do, to avoid both of them

7    being imprisoned at the same time.  If one of them were to stop

8    contesting detention, obviously, they could have begin serving

9    pretrial -- presentence detention would count towards their

10   sentence.  So, that's something I hope the defendants will

11   think about and take seriously, given what I understand of

12   their personal situation.

13           But that said, that's where I am right now, and I do

14   think it would be useful to hear from Mr. Junker, possibilities

15   and we've had a few discussions between my office and him about

16   some of these possibilities.  To me, one obvious thing, the --

17   the language in the detention -- the conditions is sort of

18   directed, as I read it, mostly at ensuring that the probation

19   officer is provided information about income, and what we're

20   talking about here is more focused on concerns about money

21   going out, and so to the extent that there's some ambiguity in

22   there, it seems like we should be very clear that the

23   defendants have to provide the probation office with all of the

24   accounts they use, all of their bank accounts, and access to

25   that, and that seems like an obvious requirement.

1          The other thing that it seems that we should do is to

2     prohibit the defendants from using any of their funds for

3     gambling or for conducting cryptocurrency transactions, and

4     potentially also as sort of a way to make sure we're capturing

5     that, preventing any purchases of gift cards in maybe an amount

6     over, I don't know, 50 or a hundred dollars a day, without

7     previous permission from the probation officer.

8          The government, it seems to me, has access to enough

9     information that if those kinds of conditions were violated, we

10    would be able to -- they would be able to let us know pretty

11    quickly, in which case then my decision about detention would

12    be pretty easy to reverse.

13         Those are the sorts of things I'm considering, at this

14    point.  So, Mr. Junker's view on the feasibility of those sorts

15    of limitation.

16         *PROBATION:*  And, Your Honor, I guess to the point of

17    identifying all of the accounts that are presently open, I have

18    seen it in the past, not necessarily through a similar case,

19    but where, perhaps, both parties can review what those

20    documents -- what those accounts look like, so they are all on

21    the same page before I know what I'm looking at or trying to

22    look for.  The very small amount of, I guess, information and

23    case knowledge with this, I just don't think our office has the

24    ability, from a financial investigation standpoint, to be able

25    to determine whether or not what we're getting, just from the

1    defendants, may be everything.

2           THE COURT:  Right.  I agree with that.  And that's

3    part of, I think, the way the condition is worded, that says

4    they have to provide access requested by you.  I want to put

5    the burden on the defendants, and then to extent the government

6    has information that something else should be there, they

7    should certainly provide that to you, rather than, sort of, the

8    burden being on you to kind of investigate and find it out.

9           So I certainly would -- that would be kind of the

10   point of it would be that they would have to affirmatively

11   provide you any of that information.

12          PROBATION:  And our office is limited in being able to

13   conduct any type of, you know, computer monitoring search, if

14   you will, and so it would be difficult to detect.

15          THE COURT:  Yeah.  So again, I understand that.  My --

16   my imposing conditions like the ones I was suggesting here,

17   would -- first of all, my hope would be that the defendants

18   would comply with them and nobody would have to do anything

19   about it, and -- but to the extent that they weren't complying

20   with them, based on the evidence I have seen, the government

21   has pretty good access to let us know, and I would think they

22   would provide that information first to you, and then to me, if

23   necessary.  So, it wouldn't really -- neither of these would,

24   in my -- I guess I would -- *neither* implies two, but adding the

25   conditions I have in mind, wouldn't really impose any

1    obligation on probation, other than to be the place where this

2    information is kept, and that if there are violations alleged,

3    then you would follow your normal process, but it wouldn't

4    impose any, sort of, investigation requirement on you, as I'm

5    picturing it.

6         *PROBATION:*  Certainly, Your Honor, and if you could

7    repeat those, so I can get those captured --

8         *THE COURT:*  I may actually -- probably will try to

9    write them down, just to make them clear to everybody.  Does

10   the government have a position on that?

11        *MS. WEISS:*  Yes, Your Honor.  I think to the extent

12   we're going to be talking about adjusting the conditions to

13   provide the probation officer with all accounts they use, we

14   also need to be clear that they need to provide holdings for

15   all peer-to-peer cites, because Venmo you can sit on money in

16   Venmo or in PayPal or any of these things.  They kind of act

17   like pseudo bank accounts for periods of time, as well as all

18   crypto wallets and any accounts with various crypto exchanges.

19   I think all of that would need to be put forth transparently

20   in, you know, in some sort of summary fashion for probation.

21   Your Honor could consider a financial statement under oath,

22   where she certifies that these are all of the accounts, where

23   everything is held.  I do think that there's just enough smoke

24   here that we need to be really holding these defendants to

25   account to being honest about what's happening.

1             But we agree with the purchases of gift cards and

2    agree that, you know, any sort of additional information that

3    would bring us back here.  It is a strange -- 3148(b) does

4    allow the government to file for violations of presentence

5    conditions.  Obviously, our preference and the practice of this

6    district that these things go through probation, but there's a

7    disconnect in terms of what Mr. Junker can do during the day

8    and what we can do, and I would just like to know that

9    everything we're going to get is still always going to be -- I

10   apologize -- on a little bit of a lack.  It just is.

11            THE COURT:  Fair enough.  I understand that, and I

12   realize you could directly seek that for sure, but so thank you

13   for that.

14            MS. WEISS:  Thank you.

15            THE COURT:  Why don't I get the defendant's position.

16            MS. HUBBARD:  Your Honor, the terms that the Court had

17   proposed, as far as a disclosure and all of that, those seem

18   reasonable to me.  I think the additional -- as far as the

19   current accounts that the Tews are currently holding, I have

20   concerns about what the prosecutor was just saying, from a

21   number of different perspectives.  There are still Fifth

22   Amendment concerns, I think, that are very real in this case,

23   with respect to where wallets might be held, money stored in

24   wallets, crypto accounts, things like that.  I don't believe it

25   is the Court's job or pretrial, as an arm of the Court's job,

1    to conduct the government's investigation for them, as far as

2    trying to track down all of the Tews' assets and things like

3    that.

4         I have concerns, as I expressed in the motion, that

5    Ms. Weiss is the one leading these efforts on behalf of the

6    government, given other things that we know, the assets that

7    she is trying to locate, could then be used to satisfy the

8    judgment that's outstanding in a civil case.  So --

9         THE COURT:  Yeah.  I will just tell you, I'm not

10   inclined to require all of that.  I'm mostly concerned about

11   going forward, and if there were improper things being done in

12   the past, that's my fault for allowing it to happen, but I

13   mostly want to make sure that we don't allow it going forward.

14        So if there is a prohibition on anymore purchases of

15   cryptocurrency, and it seems to me that with disclosure of the

16   type we're talking about, which I don't know that I need a

17   disclosure of like how much money is sitting in a -- in a Venmo

18   account, but I do -- I do intend to require disclosure of Venmo

19   accounts that the defendants have, and then the government

20   seems to be able to tell, and these apps are very good at

21   keeping an eye on what we're all doing with them, and then the

22   government can tell if it's being used for cryptocurrency going

23   forward.  And if it is, then we will be probably revoking

24   anyone's bond and having them detained between now and

25   sentencing.

1          So I'm not -- I don't think I'm going to require

2    disclosure of every wallet that someone might have at this

3    point, because I'm concerned now about making it clear that

4    going forward, use of cryptocurrency, while it's legal for the

5    rest of us, and gambling is somewhat legal, given the position

6    the defendants are in, it's not something that they can do with

7    their apparently limited funds, and so I think that balances,

8    kind of, the concerns I have going forward, making sure that

9    funds are used properly, that they are not being hidden or

10   dissipated in the anticipation of a financial penalty, but not

11   trying to, sort of, undue things that may have -- may have

12   happened in the past, that are, I don't think what I'm trying

13   to get at.

14          Mr. Tew want to weigh in?

15          *MR. SCHALL:*  Your Honor, I'm not sure what I'm going

16   to say, so we will see what happens.  But if the goal is the

17   prospective conditions, I understand the lag the government

18   has, but I believe Mr. Tew can access his sole bank account on

19   the first of the month or whatever the statement issues, and it

20   could be a condition for -- you know, for him, for his wife, if

21   she has similar accounts, that those documents are provided

22   within 24 hours of being available or something of that

23   magnitude.

24          I believe that Mr. Tew's income comes through that

25   account, and that if future behaviors cease, that that

1    statement will make that pretty clear, from my client's

2    perspective, as of the first of the month, or whenever that

3    credit union issues its account statements, and that there

4    won't have to be much lag time there.

5              Mr. Tew's income is predominately based -- solely

6    based right now, but there are potential for other clients, two

7    payments from a client that pays him twice $10,000.  First of

8    the month and the 15th of the month, and that's reflected in

9    bank records that the government has provided.

10             Everyone in this room knows what mundane bank account

11   records look like, and if the Court orders, as of today, when

12   we all leave this room, that things normalize by May 1st, bank

13   records, Court may have its answer by June 1st, the Court may

14   have its answer.  I don't know.  But there seems to be a

15   specific condition, perhaps, that bank records from Credit

16   Union of Denver shall be provided by the defendant, within 24

17   hours of receipt, no later than the third day of the month.

18   Some such.  That shines a light on the activity.  I don't

19   believe that my client has access to incomes, apart from his

20   current client; that's my first thing.

21             Second thing, if the Court considers more onerous,

22   backward-looking disclosure conditions, such as, what accounts

23   do you have with whatever, perhaps the Fifth Amendment

24   concerns, which I don't think I have any on behalf of Mr. Tew,

25   perhaps those could be assuaged by a date certain, in the

1    future.  I'm going to make up a number.  May 10th, that says

2    you can disclose all of these by that time or alternative, you

3    can go into custody.  I don't know.

4          But one thing I am concerned about, Your Honor, having

5    attempted this in other cases, is at which point either my

6    client or his codefendant want to start serving their time, the

7    marshals won't just take them without an order from the Court

8    and without a warrant or without some kind of paperwork, and so

9    to the extent we could have, when we leave here, a mechanism to

10   achieve that, if my client chooses to go in, I would ask for

11   that.

12         THE COURT:  Yeah.  So let's see, taking that first.

13   Certainly, I think if anybody decides that that's in their best

14   interests, which it may very well be, as I indicated.  I think

15   if you -- I would be -- what I would be willing to entertain

16   and probably to grant, given what I know about this case, a

17   motion for a Court order that would, and I would have to think

18   exactly how to phrase it, but essentially allow a defendant to

19   withdraw their ... their contesting of detention, and I would

20   probably recommend a date that you -- I doubt you want to just

21   be swept up at any particular time, but say any time after --

22   after, and then I think we could accommodate that so that after

23   their bond is revoked, as of such and such date, and then we

24   would treat them as if they had just been detained, walking out

25   of court, and I would assume, Mr. Junker, they would coordinate

1    with you where to report.  Does that make sense?

2            *PROBATION:*  I think if there's a clearcut order from

3    Your Honor, we can coordinate with the Marshals Service.  They

4    can show up to the third floor.  I have to clarify that, but I

5    think --

6            *THE COURT:*  Yeah.  Because it's slightly different

7    than starting your actual sentence, but that would make sense

8    to me.  Okay.  Does -- does that answer that question,

9    Mr. Schall?

10           *MR. SCHALL:*  It does.

11           *THE COURT:*  And then my -- why don't I say this sort

12   of about the backward-looking stuff.  I want to separate that

13   from the detention, and if anybody wants me to look back for

14   whatever purpose, for potential additions to restitution

15   requirements or whatever reason, looking backwards, file

16   something separate, and I today just want to make sure going

17   forward, that my decision not to detain the defendants at this

18   time, that the conditions address that.  And so, I'm not going

19   to order anything in addition -- anything backwards looking.

20   I'm going to order from now on all bank accounts that either

21   defendant has or has access to, have to be disclosed to the

22   probation office, and I think Mr. Schall's idea of say within

23   48 hours of receiving the bank account, they have to provide it

24   to the probation office.

25           The defendants cannot, going forward, engage in

1    anymore cryptocurrency transactions.  They can't engage in

2    gambling, online or in person, and they can't, since it seems

3    highly likely to be tied to -- some of these, at least, seem

4    likely to be tied to cryptocurrency or other transactions that

5    make it very easy to hide financial resources that any

6    transaction -- any gift card transactions over $50 dollars in a

7    given day, have to get prior approval of the probation officer.

8           As I said, I think I will write these out and provide

9    them to everybody, but, that's what I think I'm going to modify

10   the conditions to try to be clear on that.

11          Does that make sense?  Answer all of your questions?

12          MS. HUBBARD:  Yes, Your Honor.

13          THE COURT:  The government understand?

14          MS. WEISS:  Yes, Your Honor.  Just two points of

15   clarification.  The condition about notifying of accounts, that

16   would include notifying the probation officer of any other

17   accounts are opened at any other time.

18          THE COURT:  Yeah.  So, ongoing, sort of, affirmative

19   obligation of any accounts they have or open in the future,

20   whether personal or business, because the current condition is

21   a little unclear on some that of I guess.

22          MS. WEISS:  Sure, sure.  And, Your Honor, just to put

23   it down into practical terms and try and understand what the

24   government's ongoing concern is, the only way that we have any

25   insight into any crypto activity right now is by proxy through

96

 1   seeing transactions from crypto exchanges, transactions from

 2   peer-to-peer exchanges that are interacting with crypto.  None

 3   of the records that we presented here today, except for Zero

 4   Hash, come from any of these crypto exchanges or websites or

 5   anything at all.  So, we don't know if there's one wallet, if

 6   there's 25 wallets, if there's 25 cents of worth in

 7   cryptocurrency or if they have all been gambled away or if

 8   there's a significant amount of money, and I understand a

 9   blanket prohibition on conducting any cryptocurrency

10   transactions hopefully addresses that.  The problem is there's

11   all kinds of ways to dissipate and exchange crypto that could

12   go to other people similar to how we saw in this case, other

13   people with access or trusted people to hold onto these assets

14   on their behalf, and that's not going to come up in an

15   accounting of bank accounts or peer-to-peer platforms

16   necessarily, but that is why we're requesting an accounting of

17   what wallets are out there.  What account statements with what

18   exchanges are out there, so that Mr. Junker has a fighting

19   chance of understanding this.  Otherwise, there's a lot of

20   other ways that those assets can be dissipated that isn't going

21   to show up in an additional bank record.

22         THE COURT:  I think I understand the concern.  I don't

23   think it's necessary to do what you are asking, based on what I

24   have seen and the information that I think -- the combination

25   of these conditions, together with the information we do have

         1    access to.  I don't think that's necessary, but I appreciate

         2    the concern.

         3              MS. WEISS:  Understood.  And, Your Honor, we're just

         4    making our record, to be clear.  Thank you.

         5              THE COURT:  Fair enough.  I understand.  All right.

         6    Is there anything else that you need to bring up?

         7              MS. WEISS:  I have one minor housekeeping point, which

         8    is totally mostly unrelated to any of this.  The local rules

         9    require the government to file their sentencing statement 30

        10    days after the convictions.  We've done that.  I believe the

        11    same rules require the defendants to file their responses

        12    within 14 days of that, and we have not seen those responses

        13    come through.  So, understanding that sentencing is quite aways

        14    out, it is going to be a complicated case, and getting those

        15    sentencing statements started and a deadline for those

        16    responses would probably be better for everyone.

        17              THE COURT:  Okay.  Mr. Schall, you are about to --

        18              MR. SCHALL:  Correct me if I'm wrong, please, but I

        19    wasn't even intending to file one.  I didn't think we had to,

        20    and given ... given the prior ex parte hearing with the CJA

        21    issue and this hearing, that thought had not even entered my

        22    mind, to be honest.

        23              THE COURT:  Yeah.  I'm trying -- the 14-day thing has

        24    to do with responses to objections to the presentence report.

        25    So you may be right, there is something else, but at this point

1    I don't think you're late on anything, but how about if I ask

2    you to just doublecheck the rules on that.

3         *MS. HUBBARD:*  Your Honor, just, you know, I have

4    worked for the federal courts for a really long time, and never

5    have seen defense counsel file a sentencing statement after

6    trial.  So I would join with Mr. Schall that we were not

7    intending to. I didn't think we were supposed to.

8         *MS. FROST:*  We are not obligated under the rule.

9         *MS. HUBBARD:*  You know, we usually put our sentencing

10   argument out there through the motion for departure slash

11   variance, is what I had in mind, as far as when we would be --

12   because we're usually in the position of responding to the PSI,

13   which we have not even done the PSI interview yet for Mrs. Tew,

14   just to give the Court some transparency about where we are

15   with that sort of stuff.

16        *THE COURT:*  All right.  Just take a look, and if we're

17   mistaken that's okay.  Anything else?

18        *MS. WEISS:*  Not from the government.  Thank you

19   Your Honor.

20        *MS. FROST:*  We have one second, Your Honor?

21        *THE COURT:*  Okay.

22        *MS. HUBBARD:*  Nothing from Mrs. Tew.

23        *THE COURT:*  Thank you.

24        *MR. SCHALL:*  Nothing further Your Honor.

25        *THE COURT:*  Okay.  Thank you all.  The Court will be

1    in recess.

2              THE COURTROOM DEPUTY:  All rise.  Court is now in

3    recess.

4         (Recess at 1:21 p.m.)

5                              INDEX PAGE

6    Witnesses:

7    PROBATION OFFICER JUNKER

8    Direct Examination by Ms. Weiss      9

9    Cross-Examination by Mr. Schall      20

10   Cross-Examination by Ms. Hubbard     24

11   Redirect Examination by Ms. Weiss    27

12   AGENT PALMER

13   Direct Examination by Ms. Weiss       29

14   Cross-Examination by Ms. Frost        65

15   Cross-Examination by Ms. Hubbard      72

16   Redirect Examination by Ms. Weiss     81

17   Exhibits       Admitted

18   2                    34

19

20

21

22

23

24

25

1                       REPORTERS' CERTIFICATE

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4          Dated at Denver, Colorado, this 15th day of January,

5     2025.

6                         S:/ Tamara Hoffschildt, FCRR, CRR, RMR

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25